## IN RE PASCHAL.

1. The attorney or solicitor, who is also counsel in a cause, has a lien on moneys collected therein for his fees and disbursements in the cause, and in any suit or proceeding brought to recover other moneys covered by the same retainer.
2. A motion to pay into court the moneys collected will not be granted, but the parties will be left to their action, if the attorney is guilty of no bad faith or improper conduct, and has a fair set-off against his client, which the latter refuses to allow.
3. A party has a general right to change his attorney, and a rule for that purpose will be granted, leaving to the attorney the advantage of any lien he may have on papers or moneys in his hands as security for his fees and disbursements.

THESE were two motions on George W. Paschal, an attorney and counsellor of this court, and as such lately repre-. senting the State of Texas in suits which it had here. The first motion being in the case of that State against White, Chiles and others (No. 4 on the original docket), already largely reported; the second, in the case of the same complainant against Peabody & Co. (No. 6 on that same docket), not yet in any way adjudged.

In the first of the cases the motion was for an order on Paschal to pay to the clerk of this court, for the benefit of the State of Texas, the sum of $47,325 in gold, alleged to have been received by him under the decree in the first of the two cases above mentioned. In the other (the suit

---

* 1 Black, 582.

against Peabody & Co.), that the name of the said Paschal be stricken from the docket as counsel for the complainant, and that he be forbidden to interfere with the case. Rules to show cause having been granted, with leave to either party to file affidavits, Paschal, at the return of the rules, answered, filing a statement under oath by way of cause why the motions should not be granted.

; This answer, in the first of the two cases, set forth the history of the litigation instituted for the recovery of the Texas indemnity bonds and the part taken by him therein, both in the two cases in which these motions are made and in other cases and proceedings. A portion of this history is published in the report of Texas v. White, Chiles, et al.,* and a portion in the case of Texas v. Hardenberg.†

The answer admitted that the respondent had received the sum alleged, viz., $47,325 in gold, paid under the decrees of this court, but alleged that his disbursements had been $13,355.98 (of which he gave an account by items), and that his charge for services was $20,000 in the case of Texas v. White, Chiles, et al., alone; the reasonableness of which charge was corroborated by affidavits of highly respectable counsel. The balance, and much more, he claimed as due to him from the State of Texas for his services in relation to others of this same lot of indemnity bonds, for the recovery of which he was originally retained by the governor of Texas, as well as for other matters specified in the answer, into the merits of which the court deemed it not necessary for it to go, inasmuch as neither party had asked it to settle or liquidate the accounts between them.

It appeared by the answer that at the breaking out of the rebellion there were in the treasury of Texas seven hundred bonds of the United States of $1000 each, belonging to the school fund of the State, and known as the Texas Indemnity Bonds, being part of the $5,000,000 of bonds delivered to the State at the time of its admission into the Union. These bonds by their terms were payable to the bearer, but

---

* 7 Wallace, 700.                    † Supra, 68.

by statute of Texas were required to be indorsed in order to be available in the hands of the holder. The particular bonds which were the subject of the respondent's services, had not been indorsed by any governor of the State, but its military board nevertheless disposed of them for the purpose of aiding in carrying on the war. Of these bonds one hundred and thirty-six came into the hands of White, Chiles, and others, about one hundred and fifty into the hands of Peabody & Co., and various others into the hands of other persons. It was contended by these parties, that having received the bonds in good faith, they were entitled to be paid their full amount by the government of the United States, and many of them were so paid. But it was set up by the answer to the present rules, that, by the indefatigable exertions of the respondent, payment was stopped on a large number of the bonds, and suits were instituted against the parties who had received them, or had received the money secured by them.

The respondent was employed by A. J. Hamilton, the provisional governor of Texas, in 1865, to carry on these prosecutions. He first commenced a suit against White, Chiles, et al., in Texas, but not being able to serve them with process he removed his operations to Washington, and there commenced the suit, now No. 4 on the original docket, in which the money in question was recovered. He also took the proper steps and presented elaborate arguments in the treasury department to prevent a redemption of the bonds and to render the prosecution effectual; being partially successful in this object, as before mentioned. No stipulation was made with Governor Hamilton for any certain fee for these services, but it was understood between them that the respondent should charge such fees as the responsibility, expense, time, skill, and services should render proper. On the faith of this understanding, the respondent left his home in Texas, where his practice was lucrative, and came to the North to attend to this business. For a time, on a change of local administration in Texas, other counsel were employed in the cases, but never, as it appeared, to

the entire displacement of the respondent; and in December, 1867, he received the following special engagement from E. M. Pease, then governor of Texas:

"EXECUTIVE OF TEXAS,

"AUSTIN, December 3d, 1867.

" GEORGE W. PASCHAL, ESQ.

"DEAR SIR: Your two letters, of the 9th and 14th of November, came together a day or two since. I had intended to write you before this, and ask you to make a thorough examination of the suit at Washington in behalf of the State against Chiles and others, for certain United States bonds belonging to the school fund of Texas, but a great press of business has prevented me from doing it. I now wish you to make such an examination, and make a full report thereon to this office as early as possible. In the meantime you are fully authorized to take charge of and represent the interest of the State in said suit. Your compensation will be dependent upon the action of a future legislature, unless a recovery is had in the suit, in which event I shall feel authorized to let you retain it out of the amount received.

"Yours, with respect,

"E. M. PEASE."

The power of the governor to make such an arrangement was not disputed. The legislature, in October previous, had passed an act expressly authorizing him to take such steps as he might deem proper to recover possession of these bonds, and to compromise with the parties holding them, or through whose hands they had passed. The respondent accepted these terms and continued to manage and conduct the subsequent litigation, both in this case of White, Chiles, et al., and other cases. In addition to the above letter, Governor Pease, on the 13th of November, 1868, executed to him a power of attorney, constituting him his agent and attorney in fact, to represent the State of Texas in any suits then pending, or thereafter to be instituted, in any courts in the District of Columbia, in relation to any of the said bonds, with power to settle and compromise with any of the parties. Under these various retainers and engagements, the re-

spondent gave his attention for several years to the recovery of the bonds, and finally succeeded in recovering the amount before mentioned from the defendants in the case of White, Chiles, and others, and made considerable progress in negotiating a settlement of those which had come to the hands of Peabody & Co. In June, 1869, Governor Pease visited Washington, and on being made acquainted with the respondent's proceedings, approved of the same, and entered into a further arrangement with him in relation to 300 of the said bonds, which had been carried to Europe by one Swisher (of which the Peabody bonds were a part), by which he agreed that the respondent should be paid for carrying the litigation through, twenty-five per cent. on the one hundred and forty-nine bonds received by Peabody & Co., and twenty per cent. on the remainder, being one hundred and fifty-one bonds, in the hands of Droege & Co.  Under this arrangement the respondent continued his negotiations with these parties, and was, as he believed, near effecting a satisfactory arrangement and settlement with them, when, on or about the 27th of January, 1870, he received a telegram from E. J. Davis, who had been appointed provisional governor of Texas, in place of Governor Pease, that his appointment as agent for the State of Texas was revoked.  A letter from the governor was received shortly after, containing a formal revocation of the respondent's authority as such agent, and of the power to represent the governor of Texas, given to him by Governor Pease.  The respondent alleges that this interference on the part of Governor Davis put an end to the negotiations for settlement with Droege & Co., and Dabney, Morgan & Co. (parties who had received the money on the Peabody bonds), and was entirely unauthorized by the governor, and entitles him to receive the contingent fees of twenty-five and twenty per cent., as before mentioned, and to continue as attorney and counsel in the case until his demand is settled.

He also asserts that the State of Texas is indebted to him in a balance of $17,577 for publishing, binding, and delivering to the secretary of state of Texas, 400 copies each of

five volumes of reports of the decisions of the Supreme
Court of Texas, which he reported under the laws of the
State; also that the State owes him $1000 for bringing two
suits in the District Court of Travis County, and presenting
appeals therein to the Supreme Court of the State.

On the part of the State of Texas it was shown, not only
that the governor had revoked the respondent's authority,
but that he had appointed Mr. Durant as attorney and agent
of the State in his stead, with authority to receive all moneys
due to the State; and that Mr. Durant had made due de-
mand of the respondent for the moneys in his hands, and
had required him not to intermeddle further in the suit of
*Texas* v. *Peabody et al.*

*Mr. A. G. Riddle, for the respondent:*

1. *As to the rule in the first case.* Attorneys at law and
solicitors in equity have, undoubtedly, by the English rule,
a general lien, not only upon all the papers and documents
of their clients in their possession, not only for all the costs
and charges due to them in the particular cause in which
the papers and documents come to their possession, but also
for the costs and charges due to them for other professional
business and employment in other causes; and this lien ex-
tends to all moneys received and judgments recovered. The
rule is applied in the United States, for the protection of the
bar generally. The whole subject is presented in a learned
and able note by Mr. T. W. Dwight, in the American Law
Register.*

The fact that the fee is a contingent fee, does not affect
the case. Such fees are lawful in Texas,† and have been
recognized by this court in *Wylie* v. *Coxe.*‡

* Vol. 10 (or Vol. 1, New Series), 414; see also Wylie v. Coxe, 15 How-
ard, 415; Ex parte Plitt, 2 Wallace, Jr., 453; Pinder v. Morris, 2 Caines,
165; Martin v. Hawks, 15 Johnson, 405; St. John v. Dieffendorf, 12 Wen-
dell, 261; Bradt v. Koon, 4 Cowan, 416; Hutchinson v. Howard, 15 Ver-
mont, 544; Hutchinson v. Pettes, 18 Id. 614; Gammon v. Chandler, 30
Maine, 152; Frost v. Belmont, 6 Allen, 152; McDonald v. Napier, 14
Georgia, 99; Patten v. Wilson, 34 Pennsylvania State, 299.

† Hill v. Cunningham, 25 Texas, 31.                    ‡ 15 Howard, 415.

Finally, the respondent shows that he retains the fund in good faith. This being so, the rule must fall.*

2. *As to the rule in the second case.* It is not pretended that any cause exists for Mr. Paschal's removal, except the wish of the present governor of Texas. But a contract for a contingent fee having been made, and Mr. Paschal having entered upon his work, and spent much time, labor, and thought upon it, and incurred heavy expenses, he is not dischargeable at all, or, if so, dischargeable only on payment of his full fee. He has neglected other business to devote himself to this great claim; he has made arrangements affecting his whole course of life. He is interested pecuniarily and by contract in a recovery, as actually as the State of Texas is. He cannot sue that State for the balance remaining above the sum which he can get from the fund in his hand. His only chance, since a disturbance has arisen between him and the governor of Texas, is success in the case, and a recovery from Peabody & Co. Our argument rests on the fact that the fee was to be contingent on recovery. That class of fees has been decided to be lawful, and the court cannot apply the ancient chivalric rules which govern counsellor and client in countries or states where the relation is purely honorary, and where no action will lie for even the *quantum meruit* to the new class of cases. The matter is, in them, one of business and contract; not of mere confidence and honor. In *Wylie* v. *Coxe*, Mr. Coxe had been employed by one Baldwin, upon a contract for a contingent fee. Baldwin died, and his administrator sought to revoke the powers of Coxe. But this court said that it could not be done, except upon payment of the fees. And the reason is obvious. It is because such an attorney has a power, coupled with an interest.

*Mr. Durant, contra:*

*As to the motion in the first case.* The defence presents the remarkable case of a lawyer recovering a large sum of money

---

* Pittman's Case, 1 Curtis, 186.

for his client, and then not only keeping the whole of it, but claiming an enormous sum beside. The percentage claimed is excessive. In *Wylie* v. *Coxe*, the contingent fee was but 5·per cent., and the money had been all recovered by Mr. Coxe, leaving the remaining 95 clear to the client's hand. The fruitlessness of the recovery to the client in this case, owing to the percentages claimed for Mr. Paschal, and the sums paid out for other counsel, is itself a sufficient argument in favor of the rule asked for.

By the settled laws of England a barrister cannot sue for his fees. This court has never decided that he could. *Coxe* v. *Wylie* does not decide this, nor anything pertinent to our case; for the services rendered by Mr. Coxe were not rendered in any court, nor as a barrister, but were in obtaining an act of Congress and in proving the case before a board of commissioners. Probably any intelligent man, acquainted with business and politics, could have done the same service as Mr. Coxe did.

If counsel can sue for fees he has no lien for money in his hands, and must deposit it in court. The privilege of lien is one given to attorneys only. At all events he cannot set up a lien on moneys not the specific product of his effort in the case. "The lien," says Lord Cottenham, "upon the fund realized in the suit is confined to the costs of that suit."* Here Mr. Paschal seeks to retain a large balance obtained in one case for services (as he conceives) in another; services which were to be paid for only in case of his getting certain moneys; moneys which he has failed to get.

Those who contract with the State, must rely on the discretion and good faith of the legislative body. It is a presumption of law that the sovereign power will do justice.†

*As to the rule in the second case.* The governor had the legal right to discharge Mr. Paschal.‡ Even in cases of·

---

* Bozon v. Bolland, 4 Mylne & Craig, 354.

† Gibbons v. United States, 8 Wallace, 274.

‡ Earl Cholmondeley v. Lord Clinton, 19 Vesey, 272, 274, 276; Beer v. Ward, Jacob's Chancery, 77; Bricheno v. Thorp, Ib. 300; Johnson et al. v. Marriott, 2 Crompton & Meeson, 183.

contracts for personal service for a fixed period, the employer may discharge the servant.*  The fact that the fee was contingent don't affect the case.†

Mr. Justice BRADLEY, having stated the case, delivered the opinion of the court.

The application made on ·the first of these cases (No. 4), for an order on the respondent to pay 'money into court is in the nature of a proceeding as for a contempt.  The application is based upon the power which the court has over its own officers to prevent them from, or punish them for, committing acts of dishonesty or impropriety calculated to bring contempt upon the administration of justice.  For such improper conduct the court may entertain summary proceedings by attachment against any of its officers, and may, in its discretion, punish them by fine or imprisonment, or discharge them from the functions of their offices, or require them to perform their professional or official duty under pain of discharge or imprisonment.  The ground of the jurisdiction thus exercised is the alleged misconduct of the officer.  If an attorney have collected money for his client, it is primâ facie his duty, after deducting his own costs and disbursements, to pay it over to such client; and his refusal to do this, without some good excuse, is gross misconduct and dishonesty on his part, calculated to bring discredit on the court and on the administration of justice.  It is this misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money, in conformity with his professional·duty.  The application against him in such cases is not equivalent to an action of debt or assumpsit, but is a quasi criminal proceeding, in which the question is not merely whether the attorney has received the money, but whether he has acted improperly and dishonestly in not paying it over.  If no dishonesty appears the party will be

---

* Orphan Asylum v. Mississippi Marine Insurance Company, 8 Louisiana Reports (Thos. Curry), 181.

† Carpenter v. Sixth Avenue Railroad, 10 American Law Register (vol. 1, New Series), 411.

left to his action.   The attorney may have cross demands against his client, or there may be disputes between them on the subject proper for a jury or a court of law or equity to settle.   If such appear to be the case, and no professional misconduct be shown to exist, the court will not exercise its summary jurisdiction.   And as the proceeding is in the nature of an attachment for a contempt, the respondent ought to be permitted to purge himself by his oath.   "If he clear himself by his answers," says Justice Blackstone, "the complaint is totally dismissed."*

All, then, that we are concerned to ascertain and decide on this motion is, whether the respondent retains the money in his hands in bad faith, and is therefore guilty of any such misconduct as will justify the court in interposing its authority in a summary way.

Upon a consideration of the facts disclosed by the answer and affidavits, the result to which the court has come, in relation to the money retained by the respondent, is, that he has not been guilty of any misconduct which calls for the exercise of, summary jurisdiction.   We see no reason to suppose that he is not acting in good faith; and whether his claim to the entire amount be valid or not—(a point which we are not called upon to decide)—it is clear that the claim is honestly made.   The case is one in which the parties should be left to the usual remedy at law, where the questions of law and fact which are mooted between them can be more satisfactorily settled than they can be in a summary proceeding.

A good deal has been said in the argument on the question whether the respondent has, or has not, a lien on the moneys in his hands.   We do not think that the decision of this motion depends alone on that question.   For, even if he has not a *lien* coextensive with the sum received, yet if he has a fair and honest set-off, which ought in equity to be allowed by the complainant, that fact has a material bearing on the implied charge of misconduct which underlies

---

* 4 Commentaries, 288.

the motion for an order to pay over the money. And when, as in this case, there exists a technical barrier to prevent the respondent from instituting an action against his client (for it is admitted that he cannot sue the State of Texas for any demand which he may have against it), it would seem to be against all equity to compel him to pay over the fund in his hands, and thus strip him of all means of bringing his claims to an issue. Whilst, on the other hand, no difficulty exists in the State instituting an action against him for money had and received, and thus bringing the legality of his demands to a final determination.

But in the judgment of the court the respondent has a lien upon the fund in his hands for at least the amount of his fees and disbursements in relation to these indemnity bonds. His original retainer by Governor Hamilton related to all the bonds indiscriminately, and much of the service rendered by him has been rendered indiscriminately in relation to them all. With regard to the White and Chiles bonds the agreement of Governor Pease was express, that in case of recovery the respondent might retain his compensation out of the amount received. In England, and in several of the States, it is held that an attorney or solicitor's lien on papers or money of his client in possession extends to the whole balance of his account for professional services. But whether that be or be not the better rule, it can hardly be contended that, in this case, it does not extend to all the fees and disbursements incurred in relation to all of these indemnity bonds. And, in this country, the distinction between attorney or solicitor and counsel is practically abolished in nearly all the States. The lawyer in charge of a case acts both as solicitor and counsel. His services in the one capacity and the other cannot be well distinguished. And, as a general rule, counsel fees, as well as those of attorney or solicitor, constitute a legal demand for which an action will lie. And whilst, as between party and party in a cause, the statutory fee bill fixes the amount of costs to be recovered, as between attorney or solicitor and client a different rule obtains. The claim of the attorney or solicitor

in the latter case, even in England, extends to all proper disbursements made in the litigation, and to the customary and usual fees for the services rendered.

The fee bill adopted by Congress in 1853 recognizes this general rule and, in fact, adopts it. By the first section of that act it is expressly declared, that nothing therein shall be construed to prohibit attorneys, solicitors, and proctors from charging to, and receiving from, their clients, other than the government, such reasonable compensation for their services, in addition to the taxable costs, as may be in accordance with general usage in their respective States, or may be agreed upon between the parties.

The change in the rule relative to fees and costs has been gradually going on for a long period. In Pennsylvania, counsel fees could not be recovered in an action so late as 1819, when the case of *Mooney* v. *Lloyd*,* was decided. But, in the subsequent case of *Foster* v. *Jack*, decided in 1835,† the contrary was held in a very able opinion delivered by Chief Justice Gibson. And in *Balsbaugh* v. *Frazer*,‡ Chief Justice Black delivered the opinion of the court in a series of propositions which strongly commend themselves for their good sense and just discrimination. The court there held that in Pennsylvania an attorney or counsellor may recover whatever his services are reasonably worth; that such claim, like any other which arises out of a contract, express or implied, may be defalked against an adverse demand; that an attorney who has money in his hands, which he has recovered for his client, may deduct his fees from the amount; that if he retain the money with a fraudulent intent the court will inflict summary punishment upon him; but if his answer to a rule against him convinces the court that it was held back in good faith, and believed not to be more than an honest compensation, the rule will be dismissed, and the client remitted to a jury trial.

In New York, counsel fees have always been recoverable on a *quantum meruit*. In the case of *Stevens & Cagger* v.

---

* 5 Sergeant & Rawle, 411.                     † 4 Watts, 334.
‡ 19 Pennsylvania State, 95.

*Adams,** Stevens recovered $300 for counsel fees and $50 for maps made to be used in a cause. It was held by the court that the fee bill, which declares it unlawful to demand or charge more than therein limited, has reference only to the question of costs as between party and party, and not as between counsel and client. The arguments of Chancellor Walworth and Senators Lee and Verplank, in the Court of Errors, on the general subject, were exceedingly lucid and able, going to show that in this country the counsellor is regarded as entitled to a fair remuneration for his services, and to recover the same in an action either upon an express or implied contract. The code has since abolished the fee bill, and left attorneys and solicitors to make their own bargains with their clients. But the courts have held that this change has not affected the attorney's lien, even on the judgment recovered, for the amount which it has been agreed he shall receive. In one case he was to receive one-half the amount to be recovered. Judgment was obtained for $1179, and the court held that the attorney had a lien on this judgment for his half of it, and that the defendant could not safely settle with the plaintiff without paying him.†

In Texas the law has been held substantially the same. In the case of *Casey* v. *March,*‡ it was decided that an attorney has a lien on the papers and documents received from his client, and on money collected by him in the course of his profession, for the fees and disbursements on account of such claims, and for his compensation for his services in the collection of the money. If, as the respondent contends, this case is to be governed by the law of Texas, it is decidedly in favor of his lien, at least to the extent of his services and disbursements in relation to the indemnity bonds.§ As the original retainer was made in Texas, we are inclined to the opinion that the rights of the parties are to be regu-

---

* 23 Wendell, 57; S. C., 26 Id. 451.

† Rooney *v.* Second Avenue Railroad Company, 18 New York, 368.

‡ 30 Texas, 180.

§ See the cases of Kinsey *v.* Stewart, 14 Texas, 457; Myers *v.* Crockett, Ib. 257; Ratcliff *v.* Baird, Ib. 43; Hill *v.* Cunningham, 25 Id. 25.

lated by the laws of that State.   But if this be not the case, this court would be guided by what it deems to be the prevailing rule in this country ; and, according to this rule, we are of opinion that the respondent has a lien on the fund in his hands for his disbursements and professional fees in relation to the indemnity bonds; and that in retaining the said fund for the purpose of procuring a settlement of his claim he has done nothing to call for the summary interposition of this court.

The motion for an order in case No. 4, to compel the respondent, George W. Paschal, to pay to the clerk of this court the money received by him, is therefore DENIED.

The other motion we think should be granted.   The respondent, as appears from his answer, was employed by Governor Pease to proceed with and carry through the litigation relating to the 300 bonds in the hands of Peabody & Co. and Droege & Co., with a stipulation to receive 25 per cent. of the amount that might be recovered on 149 of the bonds, and 20 per cent. of the amount to be recovered on the remainder.   Granting it to be true that this contract was definitely concluded (although there seems to have been some uncertainty as to one part of it), it cannot be seriously claimed that the complainant is so fixed and tied up by the arrangement that it cannot change its attorney and employ such other counsel as it may see fit, always being responsible, of course, for the consequences of breaking its contract with the respondent.   Whether in discharging him the State has made itself liable for the whole contingent fee agreed upon, or only for so much as the respondent's actual disbursements and services were worth up to the time of his discharge, or for nothing whatever, it is not necessary for us to decide.   That question can be more properly determined in some other proceeding instituted for the purpose.   The relations between counsel and client are of a very delicate and confidential character, and unless the utmost confidence prevails between them the client's interests must necessarily suffer.   Whether in any case, in virtue of an agreement

made, an attorney may successfully resist an application of his client to substitute another in his place, we need not stop to inquire. In this case one of the States of this Union is the litigant, and moves to change its attorney for reasons which are deemed sufficient by its responsible officers. It is abundantly able, and it must be presumed will be willing, to compensate the respondent for any loss he may sustain in not being continued in the management of the cause. The court cannot hesitate in permitting the State to appear and conduct its causes by such counsel as it shall choose to represent it, leaving the respondent to such remedies for the redress of any injury he may sustain as may be within his power. Under the decision which we have just made in relation to the money in his hands, he will be able to retain that fund and any papers and documents belonging to his client until his claims shall be adjudicated in such action as the State may see fit to institute therefor.

An order to discharge the respondent, George W. Paschal, as solicitor and counsel for the complainant in the second case, No. 6, will be GRANTED.

No COSTS will be allowed to either party on these motions.

ORDERS ACCORDINGLY.