## MANNING *v.* CLARK.

### (*Circuit Court, D. New Jersey.* August 10, 1889.)

ATTORNEY AND CLIENT—COMPENSATION—CONTRACT—RESCISSION.

An attorney entered into a written contract to collect certain claims for a client, an elderly woman, in consideration of which the latter agreed to pay him a certain per cent. of the amounts collected. On collecting a claim, the attorney refused to pay the amount over until an increased compensation was paid him, alleging that the client had subsequently orally agreed to pay him the increased fees. This the client denied, but, being unable to obtain the money collected without a lawsuit, after trying to effect a settlement for six months on the basis of the written contract, finally paid the amount demanded. The attorney's testimony as to the amount of compensation to be allowed by the alleged oral agreement was inconsistent with an affidavit made by him. *Held,* that the client was justified in rescinding the written contract, and in employing another attorney to collect the remaining claims.

At Law. Action on contract by Jerome F. Manning against George Clark, administrator *d. b. n.* of Thomas Clark, deceased.

*John Linn,* for plaintiff.

*Malcolm W. Nevin,* for defendant.

WALES, J. This action has been brought to recover damages for the breach of a contract alleged to have been entered into between the plaintiff and R. M. Corwine & Son, of the one part, and Ellen Clark, the administratrix of Thomas Clark, of the other part. By the terms of the contract the plaintiff and the Corwines were to take the exclusive charge and control of certain claims, known as "Alabama Claims," which Mrs. Clark, as the representative of her deceased husband's estate, held against the United States for the capture and bonding of the schooner Howard by the Confederate cruiser Florida, and for the subsequent capture and destruction of the said schooner by the Confederate cruiser Tallahassee, and to prosecute the same before any of the courts of the United States, government departments, committees of congress, or commission specially authorized to take cognizance of such claims. In consideration of their services in this behalf Mrs. Clark agreed to pay them a sum equal to 10 per cent. of the amount which might be allowed on said claims, or either of them, and the payment of the 10 per cent. was made a lien on said claims, and on any draft, money, or evidence of indebtedness which might be paid or issued thereon. This agreement was not to be affected by any services performed by the claimant, or by any other agents or attorneys employed by her. All expenses of printing, costs of court, and commissioner's fees for taking testimony, were to be charged to the parties of the first part; and Mrs. Clark further agreed to execute, from time to time, such powers of attorney as should be necessary or convenient for the prosecution and collection of the claims. This contract was dated March 27, 1876. A few days after its execution R. M. Corwine died, and on the 12th of April, 1876, Mrs. Clark executed a power of attorney to Jerome F. Manning and Quinton Corwine, authorizing them, or either of them, to prosecute the claims, and to receive whatever should be awarded on account thereof, and give

proper acquittances therefor.    In pursuance of this agreement, the plaintiff and Quinton Corwine began proceedings before the court of commissioners of Alabama claims for the recovery of damages for the capture and bonding of the Howard.    The court at first dismissed the claimant's petition, for what reason is not stated, but afterwards allowed it to be reinstated, and awarded her the sum of $2,101.87, for which amount a treasury draft, dated January 24, 1877, payable to the order of Ellen Clark, was issued, and on the same day mailed to the plaintiff, at Worcester, Mass.    On receiving this draft, or soon thereafter, the plaintiff sent to Mrs. Clark his account for services rendered and money expended in attending to her business up to that time; but, as his demand exceeded the 10 per cent. limit stipulated for in the written contract, she refused to pay it, tendering him, however, the 10 per cent. commissions, and requesting a delivery to her of the draft.    The plaintiff retained possession of the draft, alleging that, in the interim, between the dismissal of Mrs. Clark's petition and its reinstatement, she had made a new agreement as to the quantum of fees to be paid to her attorneys, on the representation being made to her by the plaintiff that, unless an increased compensation were allowed, he would decline to proceed any further in the business.    This new agreement was an oral one, including both of the claims, and rests on the unsupported testimony of the plaintiff.    His account, as presented to Mrs. Clark, for services in the first case, was stated as follows :

| | |
|---|---|
| Twenty-five per cent on judgment, | $525 45 |
| Interest on same for over three months, | 9 00 |
| Amount paid for printing brief, | 7 70 |
| For professional services in Washington, as given in a previous letter, | 50 00 |
| | $592 15 |

Mrs. Clark never admitted the new agreement.    By her conduct and acts she uniformly denied and repudiated it.    She tried to settle with the plaintiff on the basis of 10 per cent., but was finally compelled, by his refusal to surrender the draft, to yield to his demands.    Manning acknowledged the payment of his bill, on June 27, 1877, showing that he had kept the draft for nearly six months, during the whole of which period efforts were made by Mrs. Clark and her son to effect a settlement with him according to the terms of the contract of March 27, 1876. Mrs. Clark applied to the treasury department for a duplicate draft, on the ground that the plaintiff refused to give up the original until his demand for fees had been paid, and was informed that the plaintiff had filed an affidavit setting up the new agreement, and that the question of disputed facts would have to be settled elsewhere.    In addition to this, Manning wrote to Assistant Secretary French that "the pretended written agreement they have is void and of no effect, by reason of a subsequent agreement in reference to it."    Manning also threatened to "trustee" the draft if his account was not paid.    Under these circumstances, with no other recourse but a lawsuit to establish her rights, Mrs. Clark paid Man-

ning's bill, and received the draft, and, from that time forward, there was no communication, oral or written, between the parties until August 4, 1882, when the plaintiff addressed a letter to Mrs. Clark, as follows:

"DEAR MADAM: I shall be ready now very soon to take testimony in the matter of the schooner Howard. Will you or your son be kind enough to come in and see me in reference to it. You recollect that I recovered your other claim, and took a contract from you with a power of attorney. I have succeeded, after several years' contest in congress, in securing the passage of a law which provided for the payment of the claim in about two years, but we must begin immediately to prepare the case."

This was followed by other letters from the plaintiff, under the respective dates of January 8 and 10, and December 26, 1883, in each of which he notified Mrs. Clark of his readiness to proceed with the prosecution of the second claim, and advising her that he should hold her responsible for a breach of their contract in case she employed other counsel. She made no response to these requests of the plaintiff, except, on one occasion, to send her son to Mr. Manning with an offer to allow the case to be carried on in the name of Manning and Corwine, provided they would give security for the delivery of the draft that might be issued thereon, or, to use the words of the witness, George Clark:

"I wanted an order from them for the draft to be delivered to my mother personally, and I was to deposit the amount of their claim, or give them sufficient security as to the payment of their fees, which was declined by Mr. Manning. My reason for so doing was that I did not wish to take the chances of their taking what they pleased out of the draft."

Acting on her judgment of what would be best for the interests of her deceased husband's estate and her own, Mrs. Clark employed other counsel to collect the second claim, and on February 9, 1885, received the sum of $18,292.42, which was awarded to her as administratrix, for damages for the total loss of the Howard. These are the material facts on which the plaintiff's action rests; and for Mrs. Clark's refusal to permit him to take charge of and conduct the second case, and the substitution of other counsel, the plaintiff claims to be paid 10 per cent. of the amount of the second award, to-wit, $1,829.24, by virtue of the original contract, with interest from February 9, 1885, together with damages by reason of the breach of the said contract. These constitute his own standard for the measure of the damages. The present action was begun against Ellen Clark, administratrix of Thomas Clark, deceased, but on her death, and before the taking of any testimony, George Clark, her son, was substituted as administrator *de bonis non* of his father's estate.

It would seem that Quinton Corwine had never taken a very active part in prosecuting the first claim, although he had done something, and claimed a share of the commissions; but Manning claimed the whole of it, and, by letter of January 24, 1877, requested Mrs. Clark to settle with him, and not with Corwine. On November 4, 1878, Corwine ad-

dressed a letter to Manning informing him, but without stating the reasons, that he had withdrawn from "any and all claims  *   *   *   so far as relates to any contracts, powers of attorney, or agreements, theretofore executed, in which your name was associated as attorney with that of R. M. Corwine & Son, or with that of Quinton Corwine, individually," and concluding as follows: "I decline to have my name associated with yours in any capacity whatever. I hereby forbid you the use of my name, under the penalty of the law, in soliciting or obtaining business of any kind or character whatever." Manning's affidavit, above referred to, states that in the latter part of July, 1877, he met Mrs. Ellen Clark at Hoboken, and she then "promised and agreed to pay me for services and expenses in case No. 1,945, on the docket of the court of Alabama claims, in which she was complainant, such sum as I might deem reasonable for said services and expenses. Said agreement was after said case had been dismissed from said docket by order of said court."

The death of Mrs. Clark, and the consequent loss of her testimony, subjects the present defendant to the disadvantage of being unable to furnish a direct contradiction to the plaintiff's statements in reference to the new agreement for fees,—that agreement, it is alleged, having been made with Mrs. Clark by the plaintiff when no other person was present,—unless the plaintiff's testimony can be ruled out under the proviso of section 858 of the Revised Statutes of the United States. That proviso prohibits either party, in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, from testifying against the other as to any transaction with or statement by the testator, intestate, or ward, except in special cases. The plaintiff contends that this proviso does not apply here, because he never had any dealings with Thomas Clark, the decedent, and the owner of the vessel. A literal construction of the statute would, perhaps, sustain the plaintiff's contention; but it is very apparent that to admit his testimony would give him a decided advantage over the defendant, and would impair, if not destroy, that equal footing between the parties to an action, as witnesses in their own behalf, which it was the manifest purpose of the act to preserve. The spirit of the law would seem to render the plaintiff incompetent to testify as to the conversations between Mrs. Clark and himself. Before the passage of the statutes which enable parties to the record to give testimony in their own favor, the plaintiff would not have been a competent witness, under like circumstances, and it is very questionable whether, under the proviso contained in section 858, he should now be admitted to prove, by his own testimony only, an oral contract with a deceased person who, when making the alleged agreement, was acting as the representative of an intestate whose estate would be seriously affected by a judgment in favor of the plaintiff. In *Texas* v. *Chiles*, 21 Wall. 488, the court held the statute to be remedial in its character, and that it should be construed in a liberal spirit. In *Eslava* v. *Mazange*, 1 Woods, 623, Mr. Justice BRADLEY, in delivering the opinion of the court, said:

"If the law were to allow a man to wait until his antagonist were dead, and then to sue his heirs, and put himself upon the witness stand and give his version of the affair, with no one to contradict or qualify his testimony, it would be as gross a prostitution of the forms of law as to allow a man to be judge in his own cause."

It is true that the plaintiff began this action in the life-time of Mrs. Clark; but it is none the less true that to permit him now, after her death, to testify to conversations with and to statements made by her, with no accessible evidence to refute or explain them, would practically bring about the same result which is so emphatically denounced in the opinion just cited. The question is a new and interesting one, and not free from difficulty. It will be unnecessary, however, in the view I have taken of the facts of this case, to pass upon it definitively at this time.

A contract between attorney and client is governed by the same rules which apply to contracts in general, except, owing to the confidential character of the relation between them, an attorney is often held to a stricter accountability in the discharge of his professional duty than is required of a layman. As an officer of the court, he must exercise the utmost good faith towards his client, and, being frequently the trusted depositary and adviser of the ignorant and inexperienced, he must carefully avoid any and every course of conduct calculated to excite the suspicion that he is more bent on securing his own profit than on protecting their interests. On the other hand, it is the duty of the client to confide in and assist his attorney until he has good and sufficient reason for ceasing to do so. It is well settled that an attorney has a lien for his services on money or papers in his possession belonging to his client,— a lien which is enforceable in all proper cases; nor is there any doubt that a client has the right to change his attorney and employ other counsel, being responsible always for a breach of his contract. Whether, in dismissing his attorney, the client is liable for damages will depend upon the circumstances of the particular case. *In re Paschal*, 10 Wall. 496. The question for solution here is whether Mrs. Clark was justified in rescinding her contract of March 27, 1876, in discharging the plaintiff, and in employing another attorney. After a careful consideration of the history of this case, of the conduct of the parties, and their relation to each other, I am of the opinion that Mrs. Clark acted rightly in refusing to retain the plaintiff as her attorney, after what had occurred on the settlement of his account for collecting the money awarded on the first claim. There is a want of satisfactory proof that Mrs. Clark ever knew that she had made a new agreement by which she consented to pay the plaintiff a large additional compensation. Her conduct, as we have seen, was inconsistent with the possession of any such knowledge on her part, and the plaintiff's testimony must be closely scrutinized before his statements on that subject can be accepted as true. He may have understood Mrs. Clark to assent to his proposition for the allowance of increased commissions, but it is evident that she did not so understand it. Alteration of the terms of a written contract may be proved by parol, but the proof should be clear and free from doubt, especially where one of the con-

tracting parties is an able and experienced lawyer, and the change is in his favor, and the other party is an elderly woman, who is presumably ignorant of business affairs. The plaintiff testifies that his compensation under the new agreement was to be 25 per cent., while in his affidavit he says that he was to be paid such sum as he might deem reasonable; which is a wide difference. Mr. Manning was a stranger to her, and it is hardly probable that she would leave herself at his mercy in fixing the value of his services. For his own protection, as well as in justice to his client, he should have put the new agreement into writing, and all this controversy might have been avoided. He had repudiated the contract of March, 1876; Corwine had quarreled with and refused to be longer associated with him; he had compelled Mrs. Clark to pay his account, or begin a lawsuit for the recovery of the draft; and it is not surprising, after all this, that she refused to longer recognize him as her attorney. The only wonder is that he should have persisted in the attempt to act in that capacity in the face of her opposition and protest. His right to recover damages depends entirely on the existence of the amended agreement, of which there is not adequate and sufficient proof. Judgment will be entered for the defendant.