## DIGGS *v.* THURSTON.

ATTORNEY AND CLIENT; COURTS.

1. A court may, in the exercise of its common-law jurisdiction and in a proceeding instituted for that purpose, order an attorney to pay to his client money collected for the latter, but which the attorney has retained or paid out in bad faith (citing sec. 219, Code, D. C.), and the fact that the client may have a legal remedy does not affect the summary jurisdiction of the court over the attorney under such circumstances.

2. An attorney who advises his client that another attorney, who has assisted him in carrying on the client's litigation, is entitled to a fee of 10 per cent of the recovery obtained, and who counsels the client to pay this amount, is chargeable with bad faith, where he conceals the fact that he is to receive one half of the 10 per cent fee in addition to a fee of 20 per cent stipulated for himself.

No. 2415. Submitted October 18, 1912. Decided November 7, 1912.

HEARING on an appeal by respondent from an order of the Supreme Court of the District of Columbia to pay to complainant, his client, money collected for her.      *Affirmed.*

The COURT in the opinion stated the facts as follows:

This appeal is from an order passed in the supreme court of

the District requiring appellant, Charles F. Diggs, an attorney and the defendant below, to pay to the appellee, Sarah J. Thurston, complainant below, about $965 of moneys collected by the defendant for his client in equity cause No. 25,763, entitled "Henry M. Thurston v. Francis B. Clark and Charles B. McLellan; Henry F. Woodard and Mabel Grace McKay, Executors of the Estate of Nathaniel McKay, and John C. Heald, Defendants." (See *Thurston* v. *McLellan,* 34 App. D. C. 294.) The present case was heard upon petition, answer, testimony of witnesses examined in open court, and other evidence.

The petition is in seventeen paragraphs, and sets forth in detail the alleged facts out of which the controversy grew. The averments material at this time are substantially as follows: In 1905 Henry W. Thurston entered into a written agreement with the defendant, in which it is recited that Thurston has a claim against the Nathaniel McKay estate "and desires the party of the second part to represent him in collecting said claim, and agrees to pay the party of the second part a sum of money equal to 20 per cent" of the amount collected, the party of the second part, that is the defendant Diggs, to enter suit "and to do any and all things which may be necessary in order to collect the said claim." In pursuance of this agreement the defendant thereafter, on October 15, 1905, commenced the above-entitled cause, being, and continuing to be, the sole solicitor of record for the complainant therein. A decree in favor of Mr. Thurston was finally entered in the cause on February 11, 1910, in the sum of $7,410. On December 3, 1910, Mr. Thurston wrote the defendant from Allendale, New Jersey, where he then lived, that he was very ill, and requested the defendant to prepare an assignment to Mrs. Thurston of his, Thurston's, interest in said claim and decree. On December 9, 1910, no answer having been received from the defendant to the letter of December 3, an assignment of said claim and decree was prepared and executed by said Thurston in favor of his wife, the complainant herein, and delivered to her. On December 16, following, it was further decreed in the above-entitled cause, that John C. Heald, with whom said fund had been deposited by the execu-

tors of said estate, should forthwith pay the same to said Thurston or his attorney. This resulted in the payment to the defendant, on December 17, following, the sum of $7,706.02, being the amount of the decree, with interest. On the next day, which was Sunday, the defendant telegraphed Mr. Thurston to come to Washington. This telegram was not delivered until the 19th, and Mrs. Thurston, by direction of her husband, telegraphed the defendant that Mr. Thurston was too ill to come. Shortly thereafter Mr. Thurston received a letter, dated December 19 and signed by Henry F. Woodard (a local attorney), in which Mr. Woodard mentions that Mr. Diggs has just shown him the telegram sent by Mrs. Thurston. The letter then states that the suit has been settled, but calls attention to the fact that Mr. Lambert (another local attorney), claims a lien against the amount recovered for $2,500, for services in originally obtaining the fund. The letter proceeds: "Mr. Diggs' services including those of my own are 20 per cent in the lower court and 10 per cent in the court of appeals, making 30 per cent in all on $7,700. In addition to this Mr. Diggs expects to receive the unpaid costs if that money is ever paid by Clark, which would seem to be unlikely." After further reference to the Lambert claim, Mr. Thurston was requested to wire Mr. Woodard acceptance of the settlement mentioned in the letter. On December 21 Mrs. Thurston, by direction of her husband, wrote Mr. Diggs, saying that Mr. Thurston did not understand the Woodard letter. "Mr. Thurston," Mrs. Thurston wrote, "has considered you his attorney in this case, and will be pleased to hear from you in regard to the settlement." To this letter Diggs, on December 24, responded, again referring to the Lambert claim and concluding: "You understand that the figures mentioned in Mr. Woodard's letter includes the payment of all fees due him and myself." On December 26 Mr. Thurston died, and on December 30 Mrs. Thurston came to Washington and filed her assignment of said claim and decree. Mrs. Thurston finally arranged to meet Mr. Diggs at his office on the morning of December 31. At this interview Diggs was informed of the filing of the assignment and that Mrs. Thurston was in

great need of money. Mr. Diggs suggested going to Mr. Woodard's office, to which suggestion Mrs. Thurston demurred. Finally, however, she accompanied Mr. Diggs to Mr. Woodard's office, where the question of Woodard's right to compensation for services performed in connection with said suit of her husband was discussed. During the interview a letter was dictated to Mrs. Thurston and signed by Woodard and Diggs, in which it is stated: "After the conversation of Mr. Diggs and myself with you to-day, we have concluded that it will not be amiss to write you a few suggestions which may be helpful to you in administrating your husband's estate and also taking care of your own interest." The assignment of Mrs. Thurston is then mentioned and its legal effect set forth. Mrs. Thurston is then advised, after being appointed administratrix, to write Diggs, authorizing him to compromise the Lambert claim. The letter continues: "You are at liberty to write to Mr. Diggs or myself at any time that you feel in doubt, and we will be glad to advise you without any charge. We confirm our understanding as contained in my letter to you of December 19th as to the settlement to be made, and, after deducting the 30 per cent, Mr. Diggs will hold the balance of the fund ready for you just as soon as administration is taken out." In both her petition and testimony Mrs. Thurston insists that at this interview she did not assent or agree that the Woodard fee should be paid. On January 5th Mrs. Thurston wrote Diggs, inclosing her letters of administration and requesting him to forward her "the $2,890 agreed on," which sum the petition alleges Mrs. Thurston understood to be a partial payment, and not the balance due her. To this letter Diggs responded on January 13th. In this letter reference is made to the claim of one Enright that he be paid $294. Upon the receipt of this letter Mrs. Thurston came to Washington and protested to Diggs that Woodard was not entitled to anything. The petition avers that Diggs then informed her that, "by her silence during the interview on December 31 with said Woodard," she had consented to said added 10 per cent, and that, acting upon her silence, he had paid Woodard and she was legally bound by the payment. The col-

lection by Diggs of $236.60 from the surety on said McLellan's bond for costs in said original cause, and the retention of said amount by Diggs are then set forth.

The petition further avers that before the employment of Diggs, Thurston sought to employ Woodard, who stated that he was not in a position to take the case, being an executor of said McKay estate, and thereupon recommended said Diggs, whose employment followed. Reference is also made to a letter from Diggs to Thurston, in which it is stated: "As to having Woodard or anyone else enter the case, that is entirely unnecessary, as I know the case and know that I have all the law that can possibly bear upon the questions involved. As to Mr. Woodard, it would not do under any circumstance to have his name appear of record, on account of the fact that he represented the McKay estate, and the fact that the estate has been settled does not affect the situation."

To this petition Diggs answered in detail. In this answer he admits the receipt of the letter of December 3d from Thurston, requesting the making out of an assignment to Mrs. Thurston, "but says that not thinking the matter required immediate attention, put off the making of the assignment from day to day." He admits that Mrs. Thurston met him at his office on the morning of December 31, as averred in her petition, "and discussed with this respondent *the fee claimed by said Henry F. Woodard,* stating that she did not consider that she owed him anything; that during said conversation *your respondent advised her that the said Woodard claimed a fee of 10 per cent,* and had advised this respondent that if the same were not paid he would attach the funds in his (respondent's) hands to secure its payment; your respondent advised petitioner that the said Woodard had been of counsel in said cause from beginning of the same, although he had not appeared of record;" that upon the suggestion of the respondent Mrs. Thurston accompanied respondent to Woodard's office, whereupon respondent "stated that the petitoiner did not understand about *his* (Woodard's) *fee;*" that Woodard claimed to have been employed by Mr. Thurston, "and that although he (Woodard) had not agreed upon any terms

respecting his fee, he considered the charge of 10 per cent a reasonable one." The letter signed by Woodard and Diggs, to which reference has already been made, was, according to the answer, "dictated in a distinct tone by the said Woodard, so that each and every word of the same was fully understood by the petitioner." The answer then makes reference to the Lambert claim, and avers that "after all this had been done, the petitioner expressed her consent to the said arrangement and after she had thus ratified and consented to the payment of the said fees as provided in said letter S. J. T. No. 3 (the Woodard letter of December 19th), it was suggested by your respondent that the petitioner write him a letter confirming the same and requesting payment to her of the amount of $2,890." The answer then avers that the delay in forwarding said amount to Mrs. Thurston was because one Enright, an attorney in Jersey City, New Jersey, had filed a claim with respondent on account of certain moneys alleged to be due said Enright out of said fund. The subsequent interview with Mrs. Thurston at the respondent's office, wherein she demurred to the payment of any fee to Woodard, is admitted, the respondent averring that he then informed Mrs. Thurston that the matter of Mr. Woodard's fee "had been carefully gone over in Mr. Woodard's office and that *she agreed to the payment of his fee of 10 per cent,* and that acting on this he (respondent) had paid the same."

The answer admits the payment to Woodard on December 19th, of $770.60, but denies that this amount represented the 10 per cent additional fee claimed by Woodard. The answer avers that the amount thus paid was one half of respondent's fee received on that date; that "his (respondent's) contract for fees was entirely independent of the said Woodard;" "that on December 19, 1910, the said Woodard stated that he thought he was entitled to as much as this respondent, but after talking it over and before writing the said Thurston, it was decided that the said Woodard's charge should be 10 per cent, *and it was further decided between this respondent and the said Woodard that they would equally divide the fees referred to in said letter.*"

It is further averred that Thurston consulted and employed Woodard with respect to representing him in the prosecution of his claim against Clark and McLellan, Woodard then advising Thurston "that he (Woodard) did not desire to appear of record in said cause, and suggested the employment of this respondent." Reference is then made to letters from Thurston, indicating a knowledge on his part of Woodard's connection with the case.

Respondent admits signing a præcipe, which he delivered to the surety upon the collection from said surety of said costs of $236.60 as attorney for Henry W. Thurston and Sarah J. Thurston, "but avers the fact to be that he (respondent) had a right to do so as the attorney for petitioner in that respect, and avers the fact to be that for that purpose and the settlement of Lambert's claim, and no other, he was attorney for petitioner, and that he has at no time been her attorney for any other purpose."

*Mr. Arthur A. Birney* for the appellant.

*Mr. Fulton Lewis* and *Mr. John Ridout* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

The view we take of the case renders it unnecessary to review the evidence in much detail. Both Mr. Woodard and Mr. Diggs testified in behalf of the defendant. Mr. Woodard in his testimony stated that when Mrs. Thurston, accompanied by Mr. Diggs, called at his (Mr. Woodard's) office on the morning of December 31, 1910, "Mrs. Thurston objected to the payment of a fee to me in connection with the Clark case." He admitted the agreement of December 19th for the division of fees which resulted in his being paid, upon that date, one half of the 20 per cent which Diggs deducted as his fee under the written contract previously mentioned. He admitted that much discussion preceded the final assent of Mrs. Thurston that he be paid the 10 per cent fee. He admitted that nothing was said to her about

the agreement between himself and Diggs for the division of
fees.  Mr. Woodard was asked by the trial justice whether, when
the arrangement for the division of fees was entered into, Mr.
Diggs agreed that 10 per cent in addition to the 20 per cent
deducted should be charged, and replied: "Oh, yes, sir; it was
understood that his division with me was not to affect my right
to claim *my 10 per cent* which we had agreed should be the limit,
as between us."  The Court: "Did you and he agree that you
should charge 10 per cent in addition to the 20 per cent he had
charged?"  The Witness: "Yes, sir.  As I testified, *he was to
divide his 20 per cent with me,* and I was to divide my fee
with him."  Mr. Diggs testified that when Mrs. Thurston ap-
peared at his office on the morning of December 31, 1910, she
referred to the Woodard letter of the 19th, whereupon he, Diggs,
informed her of his familiarity with its contents; that the Lam-
bert claim was discussed, and that he, Diggs, advised Mrs.
Thurston to compromise the matter if she could.  The witness
continued: "I told her that Mr. Woodard had been the counsel
in the case from the beginning, that I was brought in the case
through him, explained the work he had done in the matter,
and told her I considered he was entitled to a fee, and in addi-
tion Mr. Woodard told me when he had fixed on that 10 per
cent on his fee that if it was not paid that he intended to issue
an attachment on the fund.  I told Mrs. Thurston that it might
be well for her and me to go to his office and discuss the mat-
ter.  She did not want to go.  I said: 'You are in Washington
now, and this issue has to be met sometime, and as long as you
are here in Washington you might as well step around there,
it is only two blocks,' and she finally accompanied me to Mr.
Woodard's office.  Mr. Woodard expressed his sympathy in re-
gard to her recent loss.  I said to Mr. Woodard: 'Mrs. Thurston
does not understand about your fee;' " that finally Mrs. Thurs-
ton "agreed that this fee of 10 per cent charged by Mr. Woodard
should be paid."  When asked by the court whether, when
she agreed to this payment to Mr. Woodard, she knew that he,
Diggs, was to have part of it, the witness replied that she did
not.  The witness was further asked, in cross-examination, the

following question: "Did you at any time, directly or indirect-
ly, advise Mrs. Thurston that you were in effect sitting as a
judge in your own case, and, by advising her to pay Mr. Wood-
ard, practically advising her to pay you?" Mr. Diggs answered:
"As I said, I made no statement to Mrs. Thurston about any
arrangement I had with Mr. Woodard, absolutely none, for the
reason, as I stated, I simply considered the simple question was
whether or not Mr. Woodard was entitled to a fee."

It is now insisted that the court was without jurisdiction to
determine, under this interlocutory petition, the rights of the
parties, there being, according to the contention of the defendant,
no evidence of bad faith on his part.

Sec. 219 of the Code [31 Stat. at L. 1224, chap. 854], pro-
viding for summary proceeding against an attorney unlawfully
refusing to pay over money he has collected for a client, is at
least as broad as the rule of the common law.* *Union Bldg. &
Sav. Asso.* v. *Soderquist,* 115 Iowa, 695, 87 N. W. 433. An
attorney is an officer of the court and, as such, is bound to so
conduct himself that the administration of justice shall not be
brought into contempt and disrepute. When guilty of bad
faith in his relations with his client, his conduct tends to pre-
vent, rather than promote, justice, and the court whose officer
he is has jurisdiction at common law and is charged with the
duty of protecting the client from the bad faith of its officer.
"The ground of the jurisdiction thus exercised is the alleged
misconduct of the officer. If an attorney have collected money
for his client, it is prima facie his duty, after deducting his
own costs and disbursements, to pay it over to such client; and
his refusal to do this, without some good excuse, is gross mis-
conduct and dishonesty on his part, calculated to bring discredit
on the court and on the administration of justice. It is this

---

*Sec. 219, Code, D. C., is as follows: "Any attorney receiving or col-
lecting the money of his client and refusing unlawfully to pay the same
when demanded may be proceeded against in a summary way on notice by
said court [the Supreme Court of the District of Columbia], which may
suspend him from practice or dismiss him from its bar."—REPORTER.

misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money in conformity with his professional duty." *Re Paschal (Texas* v. *White)* 10 Wall. 483, 491, 19 L. ed. 991, 994. See also: *Re Schell,* 128 N. Y. 67, 27 N. E. 957; *Mundy* v. *Schantz,* 52 N. J. Eq. 744, 30 Atl. 322; 4 Cyc. 975. And the fact that the client may have a legal remedy does not affect the summary jurisdiction of the court over an attorney who has not acted in good faith toward his client. *Re Grey* [1892] 2 Q. B. 440, 61 L. J. Q. B. N. S. 795, 41 Week. Rep. 3.

Mr. Diggs admits the receipt of the letter of December 3, 1910, from his then client Mr. Thurston, directing the preparation of an assignment of the claim to Mrs. Thurston. He admits that when Mrs. Thurston appeared at his office on the morning of the 31st of December, following, she informed him that the assignment had been made and was then of record in the case. Mr. Thurston was then dead, as Mr. Diggs well knew. All his interest in this claim had vested in Mrs. Thurston. This Mr. Diggs also well knew. Mr. Diggs admits that Mrs. Thurston insisted that she did not owe Mr. Woodard anything; that before going to Woodard's office he, Diggs, advised Mrs. Thurston with reference to the Lambert claim and discussed with her the Woodard claim; that, at his suggestion, Mrs. Thurston accompanied him to Woodard's office, for the obvious purpose of discussing Woodard's claim. It is admitted by both Diggs and Woodard that at no time during the interview, or at any time prior to the deduction of the extra 10 per cent, was it disclosed to Mrs. Thurston that these two attorneys were to divide fees in the case; in other words, when Mrs. Thurston accompanied Diggs to Woodard's office she supposed, and had the right to suppose, that Diggs was accompanying her as her attorney; that, having received the 20 per cent. fee provided for in his contract, his sole interest in the question whether Woodard should receive an additional 10 per cent was that of a disinterested attorney seeking, in good faith, to represent his client. In fact, however, Mr. Diggs was to receive one half of the fee which he testifies Mrs. Thurston, after a lengthy interview, agreed

that he, Diggs, might pay to Woodard out of funds in his (Diggs') hands belonging to Mrs. Thurston. The contention on behalf of Mr. Diggs, that he was not the attorney of Mrs. Thurston upon this occasion, is clearly untenable. If he was not her attorney, what relation did he sustain to her upon that occasion? Both Diggs and Woodard admit that upon that very occasion they advised Mrs. Thurston with reference to her duties as administratrix of her husband's estate, and also with reference to the taking care of her own interests; that they also, upon this same occasion, advised her with reference to the Lambert claim. Mr. Diggs also admits that subsequently, when he collected the costs from the surety on McLellan's bond, he signed a præcipe as attorney for Mrs. Thurston. Indeed, the evidence is very convincing to the effect that when the assignment to Mrs. Thurston was made and brought to the knowledge of Mr. Diggs, he considered his relations to her as being the relations he had previously sustained to her husband, namely, the relations of attorney and client. When, therefore, he undertook to advise her with reference to the so-called Woodard claim, it was incumbent upon him to practice the utmost good faith, and to inform her of every fact known to him calculated to influence her judgment in the premises. The question before the trial court was not whether Mr. Thurston had employed Mr. Woodard, but whether, when Mrs. Thurston is alleged to have consented to the payment by Mr. Diggs, out of the funds in his hands, of this additional fee of 10 per cent, bad faith was practised upon her. Had she known that one half of this amount was to be paid to her attorney, Mr. Diggs, she might and probably would have had less confidence in his advice. She might and probably would have declined to permit him to deduct the additional 10 per cent from the funds in his hands. The bad faith practised with reference to this additional 10 per cent extends to and embraces the costs which were retained; in other words, it permeated and tainted the entire transaction.

The contention in appellant's brief that the letter of December 19th conveyed to Mrs. Thurston knowledge of the division of fees by Diggs and Woodard is manifestly without merit.

Neither in the answer of Mr. Diggs, nor in his testimony, nor in the testimony of Mr. Woodard, is such a contention made or even suggested. On the contrary, this additional 10 per cent is everywhere referred to as the fee claimed by Mr. Woodard, and, as we have seen, it was expressly admitted in the testimony that Mrs. Thurston had not been informed of the arrangement for the division of fees.

In view of the terms of the written contract between Diggs and Thurston, and of the circumstances under which that contract was entered into, it well might have been contended on the part of Mrs. Thurston that the services performed by Mr. Woodard were in the interest of Mr. Diggs, and that his compensation should come out of the fees provided for in the Diggs' contract. We do not suggest that the evidence would warrant such a conclusion. We merely intimate that such a contention might have been made had Mrs. Thurston been put in possession of the facts developed by the answer and testimony.

Whether said sec. 219 of the Code be no broader than the rule of the common law, a question not necessary to be here determined, the judgment must be affirmed, for in our view there was ample evidence before the trial court upon which to base it.

*Affirmed, with costs.*