JOSEPH TATE

*v.*

FRANK S. FIELD et al.

[Submitted June 25th, 1900.   Decided June 30th, 1900.
Filed February 11th, 1901.]

1. Where a bill rendered by an attorney for prosecuting a suit for his client is not only fraudulently untrue as to items for services not rendered, but inflated throughout by charges beyond what the services were worth, and, with the retainer paid by his client, amounts to more than the sum recovered of defendant, it is within the rule that if the behavior of the attorney towards his client is dishonest, oppressive or illegal, and shows a fraudulent intent, the court may proceed summarily against him for his misconduct.

2. A failure by a client to object to his attorney's bill for services until nine months after rendered is not unreasonable, where other attorneys employed by the client had been trying to see the attorney and secure a satisfactory explanation, and where the attorney could not have changed his position to his injury.

Heard on petition and answer.

*Mr. Jerome D. Gedney,* for the petitioner.

PITNEY, V. C.

The complainant presents a petition asking the court for relief against his solicitor and counsel in the cause, setting forth his employment to conduct the action, and stating the amount of moneys which he had collected from the defendants therein.

A copy of a bill in detail for services performed and moneys disbursed, amounting to $586.93, rendered by his solicitor, was annexed to the petition, which, with a letter accompanying the same, show that the solicitor had collected and received from the defendants, exclusive of costs, in payment of the decree against them, $505.49, and had received pending the suit, from the complainant, as fees, $100, making in all $605.49, from

Tate *v.* Field.

which he deducted the amount of his own bill, $586.93, and enclosed a check for $18.56 for the balance.

The complaint and prayer of the petition is that "there are divers false, exorbitant and unreasonable charges made by the solicitor against your petitioner, as shown in his bill rendered. Your petitioner prays that said solicitor may be ordered to come to an accounting for the moneys in his hands, and that an inquiry and adjudication may be made by the court touching the charges for services made by the respondent, and the compensation to which he is entitled may be ascertained by the court" and remedy given.

Upon presenting that petition an order to show cause was made against the solicitor, and on the return day he appeared and filed an answer, but further than that declined to take any part in the proceeding, though counsel appeared for him on several occasions.

Evidence on behalf of petitioner, consisting mostly of correspondence, was taken according to the practice of the court; opportunity was given to the respondent on several occasions to offer evidence on his behalf, and the matter was submitted by the petitioner's counsel.

The respondent wrote a letter to me making objection to the proceeding; first, that the same was not justified under the rule laid down in *Strong* v. *Mundy, 7 Dick. Ch. Rep. 833;* second, that there was adequate remedy at law; third, lack of authority on the part of the vice-chancellor to proceed unless the matter was specially referred to him; fourth, proper and sufficient notice of hearing was not given; fifth, that the account was delivered in March, 1899, and no objection made to it for about nine months.

The answer of the respondent gives a history of the proceedings, and admits, in substance, that several of the charges made in the bill rendered are incorrect; states that the payment to him by the petitioner of $100 was made in two payments of $50 each, and that the first payment of $50 was for services rendered before the bill was filed, and not included in the bill rendered, and should not have been credited to the petitioner. It further sets out the amount of labor and the time devoted

Tate *v.* Field.

to the conduct of the suit, and says, in effect, that although the services charged for in his bill were not all rendered, yet that, upon the whole, the bill is not exorbitant.

Before examining the matter in detail it may be well to refer to the latest judicial utterances on the subject of the propriety of this court dealing summarily with the respondent, which are found in the opinion of the court of errors and appeals in *Strong* v. *Mundy, 7 Dick. Ch. Rep. 833.* The language is this (*p. 834*): "Attorneys and solicitors are officers of the court, and there is no doubt of the authority of the court to proceed summarily against them for their misconduct. But the behavior which will justify the exercise of this summary jurisdiction must be such as is *dishonest* or *oppressive* or *clearly illegal*. If it appear that there exists between a lawyer and his client a fair dispute, which can be decided only on the settlement of doubtful questions of fact or law, the court should not exercise its summary power, but should leave the parties to their *ordinary remedies*," citing authorities.

The language just quoted was no more than a well-considered *dictum* of the court, for it was not necessary for the decision of the cause then in hand.

In order to ascertain what behavior is "such as is dishonest or oppressive or clearly illegal" we may refer to the cases cited by the learned judge; and we must also distinguish between motions to disbar and motions strictly such as that here before the court.

The first of those cited is *Balsbaugh* v. *Frazer, 19 Pa. St. 95.* That was an action at law against Frazer, an attorney-at-law, for moneys collected, and he offset against the demand a claim for services. In the trial below the claim was allowed. On error a series of propositions and rules were laid down by Chief-Justice Black, among them the following:

"3. An attorney who has money in his hands which he has recovered for his client, may deduct his fees from the amount, and payment of the balance is all that can be lawfully demanded.

"4. If the client is dissatisfied with the sum retained, he may either bring suit against the attorney, or take a rule upon him. *In the latter case the court will compel immediate justice, or inflict summary punishment on the attorney, if the sum retained be such as to show a fraudulent*

Tate *v.* Field.

*intent.* But if the answer to the rule convinces the court that it was held back in good faith, and believed not to be more than an honest compensation, the rule will be dismissed, and the client remitted to a jury trial.

[This shows that the fact of retaining out of the moneys collected a sum so large as to show a "fraudulent intent" is such "dishonest" and "oppressive" behavior as to "justify the exercise of summary jurisdiction."]

"5. If, upon the trial, the jury finds that the attorney claimed no larger fee than he was justly entitled to, and in other respects behaved faithfully and well about his client's business, he should be allowed his demand, and a verdict rendered in his favor, if he has paid the balance; or a verdict against him only for the balance, if he has not paid it; or a certificate, as in this case for what may still be coming to him.

"6. But if he has not acted in good faith; if he has attempted to defraud his client, or connived at the fraud of others; if he has received money without giving notice to the client within a reasonable time; if he has refused or neglected to pay it promptly upon demand; if he has denied that he had it when questioned by one entitled to know; or, *if he has fraudulently claimed the right to retain out of it a larger fee than the jury find to be just, he forfeits all claim to any compensation whatever, and the verdict should be in favor of the client for all the money collected, allowing no deductions for anything but actual payments.* A party must not be put to two suits to recover the same debt."

The second case cited in *Strong* v. *Mundy* is *In re Kennedy, 120 Pa. St. 497,* where Chief-Justice Paxton refers to *Balsbaugh* v. *Frazer,* and cites, with approval, the fourth proposition above set forth, and adds: "And we may add to this that a man does not lose his right to trial by jury because he is an attorney-at-law."

The third case cited in *Strong* v. *Mundy* was *In re Paschal, 10 Wall. 483,* where Mr. Justice Bradley, in delivering the judgment, uses this language (at *p. 491*) :

"The application made on the first of these cases (No. 4), for an order on the respondent to pay money into court is in the nature of a proceeding as for a contempt. The application is based upon the power which the court has over its own officers to prevent them from, or punish them for, *committing acts of dishonesty or impropriety calculated to bring contempt upon the administration of justice.* For such improper conduct the court may entertain summary proceedings by attachment against any

of its officers, and may, in its discretion, punish them by fine or imprisonment, or discharge them from the functions of their offices, or require them to perform their professional or official duty under pain of discharge or imprisonment. The ground of the jurisdiction thus exercised is the alleged misconduct of the officer. If an attorney have collected money for his client, it is *prima facie* his duty, after deducting his own costs and disbursements, to pay it over to such client; and his refusal to do this, without some good excuse, is gross misconduct and dishonesty on his part, calculated to bring discredit on the court and on the administration of justice. It is this misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money, in conformity with his professional duty. The application against him in such cases is not equivalent to an action of debt or *assumpsit,* but is a *quasi* criminal proceeding, in which the question is not merely whether the attorney has received the money, but whether he has acted improperly and dishonestly in not paying it over. If no dishonesty appears the party will be left to his action. The attorney may have cross demands against his client, or there may be disputes between them on the subject proper for a jury or a court of law or equity to settle. If such appear to be the case, and no professional misconduct be shown to exist, the court will not exercise its summary jurisdiction."

To these cases I add *In re Dudley, 12 Q. B. Div. 44,* where the earlier English cases are dealt with, first in the high court, and afterwards on appeal, where the solicitor was imprisoned for not paying over moneys, notwithstanding the Imprisonment for Debt act.

In applying those authorities it must be borne in mind that the services here in question were rendered in a suit in chancery, and not in an action at law, and that it may be a debatable question whether the "ordinary remedy" of the petitioner, mentioned in *Strong* v. *Mundy,* would not be by bill in equity for an account in which the respondent would not be entitled in the ordinary course of practice to trial by jury.

With these remarks I come to the consideration of the merits of the bill rendered; and premising that the respondent is a

Tate *v.* Field.

counsellor of the supreme court of about fifteen years' standing, will inquire whether it was honestly rendered, or was such as to show a "fraudulent intent."

The evidence upon which I shall rely consists, first, of the official files in the cause; second, the respondent's answer to the petitioner's petition; third, the correspondence between petitioner and respondent.

The proceedings in the cause are indicated by the reported opinions in *Tate* v. *Field, 11 Dick. Ch. Rep. 35; 12 Dick. Ch. Rep. 53;* and, on appeal, *12 Dick. Ch. Rep. 632.*

It was an ordinary bill to foreclose a mortgage, with a special feature asking for special relief on account of waste of the premises by the defendants while in possession, who were assignees of the mortgagor. The mortgage was given by the Powerville Felt Roofing Company, a trading corporation, which afterwards went into the hands of a receiver, who conveyed the premises to the real defendants in the cause, Field and others. They removed the building; and the bill set out those facts in addition to the ordinary allegations in a bill to foreclose.

The single question presented at the first hearing of the cause was whether or not remedy for the waste could be had in a foreclosure suit in equity. After holding that the suit was properly framed in that particular, an order for the sale of the premises was made in order to ascertain what deficiency, if any, would arise after a sale. The sale took place and the deficiency proved to be several hundred dollars. Then the cause was again brought to hearing for the purpose of ascertaining the amount of the waste; and on that hearing a decree was made against the defendants personally, which was affirmed by the court of errors and appeals.

Looking now at the respondent's bill rendered; we find, first—"April 9, 1896, Retainer, $50."

Then, April 9th, a charge for

"Drawing and serving petition and notice for leave to make the receiver of the Powerville Felt Roofing Co. a party, $15; April 9, drawing order to show cause and service of same, $10; April 20, appearance at return of order to show cause, adjourned, $10; April 28, another adjournment, $10; May 4, another adjournment, $10; May 5, another adjourn-

Tate *v.* Field.

ment, $10; May 12, another adjournment, $10; June 3, appearance and obtaining order making receiver party, $10; June 3, disbursements in this proceeding, $4.44,"

making $89.44 for charges and expenses incurred in procuring an order from the court of chancery for permission to make the receiver a party.

The amount of these charges at once arrests the attention of the court.

No proof was offered by the respondent on this subject, or, in fact, as before remarked, on any subject.

In his answer to the petition he sets up that, upon inquiry, he found that the property had been sold by Mr. E. B. Goodell, a respectable counsellor of this court, acting as a receiver of the mortgagor company, and had been conveyed to the defendants by the receiver; sets up that, after procuring a search of the premises, he prepared his bill, and then thought it necessary to make the receiver a party; that he saw the receiver, requested him to consent to being a party, that the receiver refused to do so, but referred respondent to his counsel, Mr. McCarter; that he saw the counsel and requested him to consent, and that he absolutely refused to give consent, and thereupon he prepared a petition, and that Mr. McCarter procured an adjournment of the motion, and procured further adjournments from time to time until the 3d of June, when he waived the objection and endorsed his consent on the bill to its being filed.

Now, if the deed from the receiver to Field & Company had been on record at the time that the solicitor prepared his bill, I should say that there was no occasion whatever for making the receiver a party. But it appears, by an examination of a search made by the clerk of Morris county, where the land is situate, found among the official files, that the deed to the defendants was not on record at the time the respondent was about ready to prepare his bill, if such preparation was made before the 20th of April, 1896; and I imagine it was so made, because the search is in two parts, the first one being made on the 5th of March, 1896, and the second on the 21st of May, 1896, and showed that the conveyance from the receiver was made in July, 1894, but recorded April 22d, 1896. The re-

Tate *v.* Field.

cording of the deed was probably either the result of a correspondence which the respondent had with the defendants in February, 1896, as shown by his answer, or was done by the request of the receiver. The respondent had full notice of the conveyance as early as the 10th of February, 1896.

But supposing that he was justified in taking proceedings to make the receiver a party, it is not conceivable that the receiver would have objected to being made a party unless there was some threat to hold him responsible for the waste that was committed. It is common knowledge, and must have been known by respondent, that it is a matter of course for this court, almost without question, to allow suits to be brought against receivers; and the answer, standing by itself, fails to satisfy me that there was the least occasion in this case for any such expense to be incurred in obtaining the required consent.

Then I think that the items of charges are exorbitant. The aggregate amount of them—$89.44—above mentioned shows this.

The next item is: "June 3-4, Drawing and filing bill for foreclosure and other relief, $30." This is over and above the amount allowed him in the taxed costs for that purpose. There was really nothing difficult in the bill, nor were the matters necessary to set forth its special features voluminous; and I am constrained to say that I think that charge, considering the amount involved and the previous charge of a retaining fee of $50, is, to say the least, quite large enough. And I stop here to say that the amount involved is always a matter to be considered in fixing the amount of charges for professional services outside of the fee bill. It is recognized by our statutes providing for counsel fees and by the court of errors and appeals in *Strong* v. *Mundy*.

The next charge is: "June 16, Drawing and obtaining order of publication, $10." It is well known that that is a mere matter of clerical work, and it is obtained by mailing it to the clerk, based upon the return of the sheriff. The respondent was allowed for it in the taxed bill of costs, which was paid by the defendants.

The next charge is: "June 20, Drawing, publishing and

mailing notice to absent defendants, $10." That, again, is mere clerical work, and also included in the taxed costs, and in this case he had no trouble in ascertaining where the defendants were; they were in the city of New York, and he had been in correspondence with them before bill filed. The charge is, perhaps, a proper one, but, in my judgment, like the preceding ones, is too large.

The next charge is: "Sept. 15, Copy, reading and considering answer of defendants, $15." Now, he is entitled to be allowed for the copy of the answer in the taxed bill of costs. If he chose to borrow the answer from the counsel of defendants and have it copied in his office, he should charge no more for it than the mere cost of making it. But I think he is entitled to compensation for reading and considering the answer, and I am unable to say that $15 is an extraordinary charge.

Next—September 16th—is a charge for "Drawing and filing replication, $10." Now, the replication is the one in the common form; it simply joins issue on the answer, and occupies one-third of one side of a sheet of legal cap. This I think is an exorbitant charge.

Next is: "Sept. 22, Drawing and serving notice of motion for order of reference, $10." And next: "Sept. 29, Drawing and obtaining order of reference, $10." It seems to me that both of these are exorbitant charges. It is common knowledge that the obtaining of an order of reference is a simple matter. Further, in this case, an examination of the order on file shows that it was consented to by the solicitor of the defendants; and I do not find among the papers any notice of application for it.

The next charge is: "Sept 30, Drawing and serving notice of motion to fix day of hearing, $10."

Next: "Oct. 12, Attendance at court and having day of hearing fixed, $10."

Next: "Dec. 7, Drawing and serving notice of hearing, $5." Three charges, amounting to $25. I do not find among the papers any order setting the cause down for hearing. I consider these charges exorbitant.

The next charge is: "Dec. 28, Attendance at hearing—adjourned—$10."

Tate *v.* Field.

There is no occasion for that charge, for among the papers is a consent signed by the solicitor of the defendants and dated December 26th—two days previously—that the cause be adjourned to January 11th, 1897.

The next is a charge, on February 18th, 1897, for "Attendance at hearing, trial, $25," which I think is reasonable.

The next is a charge, on April 20th, for "Copy, reading and considering opinion of vice-chancellor, $15." Then—"April 21, Drawing decree etc. in accordance therewith, $10." Then—"May 4, Drawing fi. fa. etc. $5," making a charge of $30 for studying the opinion, drawing decree in accordance with it, and the *fieri facias*. I think those charges are exorbitant. An examination of the decree shows that it was quite simple, and that it was not skillfully prepared, for the judge who signed it felt constrained to interline a material matter in it.

The next charge is: "June 14, Attendance at sale of mortgaged premises at Morristown, $25." It seems to me that is a large charge. It appears he simply attended the sale and bid in the premises for his client. This would occupy, including the trip to Morristown, not more than half a day.

Then, next, we have the proceedings subsequent to the sale: "1898, Feb. 17, Attendance at hearing, adjourned, $10." "April 28, Attendance at trial, $25." I cannot say that those two, taken together, are too large.

Then comes: "April 28, Drawing decree etc. $10." That was a very simple matter; it simply recited the appearance and decreed that the defendants pay to the complainant the sum of $480, together with costs, and a counsel fee of $10 to be allowed. I think $5 is ample for that.

Then—"1898, May 14, Making copy decree and bill of costs, and services, $10." A copy of the decree and costs could not have amounted to any such sum, and he was entitled to have them taxed in his bill of costs; and the "service" was simply the handing of it to the counsel of the other side. It seems to me that is too large a charge.

Then comes the appeal, and we have a charge as follows: "July 5, Drawing and filing answer to petition of appeal, $15." Of course, a copy of the petition of appeal was served on the

respondent, as appears by his acknowledgment, and the answer, found on page 74 of the printed book, shows that the document was of the simplest form—a mere copy of a printed form found in the books. That charge I consider exorbitant, bearing in mind the amount involved.

The next charge is: "Nov. 15, Attendance at court of errors and appeals at Trenton, and argument, $50."

This is admitted to be an untrue charge. The respondent did attend on the first day of the court of errors and appeals, when the list was called, but he did not attend the court on the argument; did not argue the cause, either orally or in print; and he states in his answer that, after studying the opinion of this court, he concluded that he could not improve upon it, and made no argument whatever.

This is, of course, a fraudulent charge, and I think it cannot be holpen by the statement in his answer that he attended on the first day of the court of errors and appeals, when the list was called. It appears by his answer that he had already made up his mind not to prepare or make an argument; and, if so, then there was no sort of propriety or necessity of his attending at the first day of the court of errors and appeals. In simple English, he allowed the appeal to take care of itself.

Next is: "1899, Mar. 7 [which is the day decision was announced], Attendance at court of errors and appeals at Trenton, $25." "Mar. 7, Drawing decree and service of copy of same, $10."

Now, there was no occasion for his attending there, and there is no proof that he did attend there. On this subject he says in his answer: "Upon being notified of the decision of the cause by the court of errors and appeals [by which he meant, as appears by one of his letters, that the decree had been affirmed] defendant immediately went to Trenton and examined the opinion filed by said court and the check list of the votes cast by the members of said court, finding that the vote was unanimous to affirm both of the decrees advised by the vice-chancellor; and thereupon defendant prepared and filed the *remittitur*."

Upon examining the decree of affirmance and *remittitur* on file in this court it is found to consist of a printed form—with

the names of the parties inserted—such as is in general use by the clerk of the court of errors and appeals in cases of simple affirmance. It covers one side of a sheet of paper. Upon the back is also printed the usual certificate of the clerk. . The decree of affirmance so certified is incorrect in that it says that the decree is affirmed, *with costs.* This circumstance seems to me to prove that the decree was entered in the court of errors and appeals without an examination of the opinion, for if the respondent had, as he states in his answer, gone to Trenton to examine the opinion, he would have found that it declared that the decree should be affirmed, *without costs;* but the clerk, in entering the rule in the ordinary course of business would be governed entirely by the check list, and would not be likely to observe that the decree was affirmed without costs, and so would have entered, as he did enter, the decree as affirmed with costs, according to the usual practice of the court.

I am unable to believe that the respondent did anything in the way of preparing or entering that decree of affirmance and *remittitur,* unless it was to simply write to the clerk to enter the usual rule for affirmance.

The idea that a counsellor of this court of several years' standing would, on a simple affirmance, find it worth while to make a journey to Trenton to enter the rule of affirmance in the minutes of the court of errors and appeals, is well-nigh ridiculous. I think the charge of $25 and $10 for that work is exorbitant.

Next is: "Mar. 7, Disbursements, $70.49." No items are given of the same, and I am unable to see where such disbursements could have been incurred.

The next item is: "Mar. 21, Drawing and executing warrant of satisfaction, $2," which is correct.

The next and last item is: "Mar. 21-23, Services in ascertaining and settling tax liens against the premises, $10." The proof shows that he did render some services in that respect; how much does not appear, but I shall make no criticism on that charge.

It appears that the cost of searches and of a copy of the

Tate *v.* Field.

stenographer's notes was allowed to him by special order, and included in the taxed bill of costs.

It is to be remarked that, in addition to the charges which he has made, the solicitor's column in the taxed bill of costs amounts to $77.30, and that, with the other disbursements, the costs amount to $122.65, and were paid by the defendants with the decree.

It appears in the letters of the respondent to the petitioner that the sheriff's fees on the sale of the premises, amounting to $40.24, were paid by the complainant to the respondent, together with the sum of $38.11 for taxes in arrear, making in all $78.35, which amount was paid to the respondent by a check sent by mail on the 22d of March, one day after the respondent executed his warrant of satisfaction to the defendants, in which he acknowledged the receipt of the decree and costs.

It would thus seem that the petitioner paid in cash $140.24, besides the cost of recording his deed, in order to get back his title to some vacant lots upon which he held a mortgage, and that the respondent took the whole (less $18.56) of the money received for waste to pay for services in collecting the amount of the waste, to wit, the sum of $505.49. It seems to me that the affair thus stated speaks for itself.

I come, with regret, to the conclusion, upon the whole case, that the bill rendered by the respondent is not only untrue, but fraudulently untrue, in that it not only charges for services not rendered, but inflated the charges throughout quite beyond what the services were worth, even had the amount involved been larger. But I cannot refrain from repeating that in all these cases solicitors and counsel are always expected to regulate their charges somewhat by the amount involved, and that here was only $500, as found by both courts. There was, at the start, no room to suppose that a large sum could be recovered; and I find it quite impossible to avoid the conclusion that the respondent deliberately framed his bill for services in such a manner as to absorb the whole product of the suit.

The respondent, in his answer to the complainant's petition, enlarges upon the large amount of study that he gave to the case, and the elaborateness of his written arguments which he

Tate *v.* Field.

presented to the court. At my special request, he has sent me the briefs of the arguments which he used,. and they accord with my memory that there was nothing extraordinary in the assistance given by him to the court in solving the questions involved.

Under these circumstances, I think the case is brought squarely within the rule laid down by the court as above cited in *Strong* v. *Mundy,* and in the cases relied upon in support of that rule. I think that the case shows a "fraudulent intent" on the part of the solicitor, such as is aimed at by Chief-Justice Black in the opinion above cited. I think the "behavior" of the respondent has been "dishonest" and "oppressive;" and further, that the case presents no "doubtful questions of law or fact to be settled." I further think that it is brought within the description laid down by Mr. Justice Bradley, *In re Paschal,* where he says: "The ground of the jurisdiction thus exercised is the alleged misconduct of the officer. If an attorney have collected money for his client, it is, *prima facie,* his duty, after deducting his own costs and disbursements, to pay it over to such client; and his refusal to do this, without some good excuse, is gross misconduct and dishonesty on his part, calculated to bring discredit on the court and on the administration of justice. It is this misconduct on which the court seizes as a ground of jurisdiction to compel him to pay the money, in conformity with his professional duty."

The last objection made by the respondent is that the complainant retained his check without complaint for a long time. The proof on that point is that the complainant, at the time the decree of the court of errors and appeals was rendered, had in his employ a Mr. Hayes, a real estate agent in New York City, and that this gentleman, at complainant's request, attempted to see the respondent with regard to the items of this bill, called at respondent's office in Newark several times for that purpose, and failed to obtain any satisfactory explanation. This occupied considerable time. The complainant seemed to be somewhat wary of employing lawyers, but finally met, in a social way, the solicitor who represents him in this proceeding, and mentioned his grievance to him, and the latter took the

matter up, studied it, sought interviews with the respondent, and finally filed the petition herein. · I think that the doctrine of laches has no application here, for the reason that the delay is not only reasonably accounted for, but that the respondent could not have changed his position in the meantime to his own injury.

The rule above cited, laid down by Chief-Justice Black, approved by Chief-Justice Paxton, and, impliedly, by our court of errors and appeals, would bar the respondent from having any compensation whatever for his services, and the result would be an order for him to pay to the petitioner not only the amount received from the decree—$505.49—but also a return of the $100 paid on account during the progress of the suit.

I am not at all sure that such remedy would not be a proper measure of justice in the present case. It must be borne in mind that the complainant has been at the expense and trouble of employing counsel to establish his claim. He is in the position, forbidden by Chief-Justice Black, of being put to two suits to recover the same debt.

But, waiving that, I am of the opinion that, under the circumstances, the $100 paid to him as compensation pending the proceeding, together with his disbursements, if any, in addition to the taxed costs received from the defendants, will be a fair compensation for his services in this case; and I will advise an order that he do forthwith pay into court the sum of $505.49, less $18.56, with interest thereon from the 21st day of March, 1899, together with the costs of this proceeding to be taxed, in which shall be included a counsel fee of $25 for petitioner's solicitor herein, and that after such payment is made the respondent may have leave to adduce proofs, if he shall be so advised, of necessary disbursements made by him in the progress of the suit not included in the taxed bill of costs, and also of special services rendered by him as stated in his answer prior to the filing of the bill and not covered by his bill rendered.