Chapman, J.
The four eases have been submitted to the court for determination, Nos. 114477, 117638, 121677 and 121676.
The first two cases seek to enjoin the city and the defendants, the Detroit & Cleveland Navigation Company and the Cleveland & Buffalo Transit Company, from entering into and carrying out the terms of certain alleged leases entered into by the city of Cleveland and the boat company defendants, November 15, 1909, and May 31, 1910.
In the first of said cases the plaintiff bases his right as a taxpayer, and claims that the proposed leases will be a diversion by the city of certain parts of what is known as Lake Yiew Park from the purposes to which it was originally appropriated.
In the second case, the plaintiff, the Cleveland &. Pittsburgh Railroad Company, seeks to enjoin the same leases, and bases its right upon the ground that it has some reversionary interest in said park property, particularly the portion thereof sought to be leased to the defendant boat companies.
The third of the cases submitted is brought by plaintiffs as tax-payers to enjoin an appropriation of the fee for park purposes, under an ordinance passed by the city council of the city of Cleveland, November 14, 1910, appropriating the reversionary interests of the original owners of the park, alleging that the declared purpose thereof is not the true purpose, but that the true purpose is to enable the city to transfer about thirty-five acres of land in Lake Yiew Park to the railroad companies for the purpose of erecting thereon a depot.
The fourth suit has for its object a similar purpose, but is brought hy the same plaintiffs as reversionary owners of rights in the original lands appropriated for the park.
From the evidence in the case, it appears that on July 9, 1872. the city council passed the following resolution:
“Resolved, by the city council of the city of Cleveland,'that it is deemed necessary and said council does hereby declare its intent to take and appropriate for park purposes, the follow *228 ing described property within said city, to-wit: all the property between the southerly line of the right-of-way of the Cleveland & Pittsburgh Railroad Company and a line commencing on the westerly line of Erie street 327 feet 6 inches north of the northerly line of Lake street and extending to Seneca street to a point 346 feet north of the northerly line of Lake street; also, all the property north of the right-of-way of the Labe Shore Railway Company, and between Erie and Seneca streets, same to be used for park purposes.”
That afterwards, on September 24, 1872, the solicitor of the corporation filed an application in the probate court to appro-priate the property described in the foregoing resolution, and further states as follows:
"The undersigned, the city solicitor of the city of Cleveland, and here appearing for and in behalf of said city, respectfully represents that said city of Cleveland is a municipal corporation and a city of the first class,' that it did by action of its council on July 9, 1872, adopt by a vote of all the members of said council present at the meeting and more than two-thirds of all the members of the council upon which vote the ayes and nayes were called, the following resolution, to-wit: Resolved by the city council of the city of Cleveland that it is deemed necessary and said council does hereby declare its intent to take and appropriate for park purposes, the following described property within said city, to-wit, all the property between the southerly-line of the right-of-way (description of property). * * * Also all of the property north of the right-of-way of the Lake Shore Railroad Company and between Erie and Seneca streets, the same to be used for park purposes. The undersigned states that the object of said condemnation and appropriation is and was to secure to said city the title absolute and in fee and clear of all incumbrance, of said described property that the same may be used for park purposes. * * * Whereupon the undersigned in the name and on behalf of the * * * of Cleveland in order to accomplish the purposes and interest of the resolution by said city co’uicil as aforesaid files this application as by law required and asks that the interests of the same above named parties to the property described with the value thereof be determined by a jury and that by the payment of said value so found by said jury to said parties by said city all the rights of title, equities and easements of the parties aforesaid in and to said parties,' be appropriated by and become vested in the city of Cleveland in' accordance with said resolution and the statutes in such cases made and provided. ’ ’
*229 That thereafter such proceedings were had in the probate court that the said property owners were awarded the sum of $204,028 for the land between Summit street and the Cleveland & Pittsburgh Railroad Company’s right-of-way, $30,375 for the land north of the Lake Shore & Michigan Southern Railway. Company’s right-of-way extending to the shore of Lake Erie. And the court decreed that upon payment of the sums awarded to the several parties defendant, the said city is authorized to take possession of the premises for the uses and purposes for which the same was appropriated. The city took possession of said lands, and paid for them by the proceeds of bonds which were issued for the purpose of raising a fund to pay for a park, and these bonds were subsequently paid from the proceeds of levies of taxes made by the city to pay for land appropriated for park purposes. The said lands were improved and beautified by moneys arising from general taxation.
About the year 1894 the city, by ordinance authorizing it, began certain improvements in front of and extending into the waters of Lake Erie from the shore of the park, the first authorized improvement being an extension by way of piling and rip-rap work, to extend Erie street into the lake; and in 1896 it authorized the setting of a row of piling extending westerly from Erie street and in front of the shore line. Thereafter the Erie street extension was further extended into the lake, and at a point about 715 feet southerly from the harbor line a row of piling was set extending to the westerly line of Seneca street prolonged northerly. Two piers were built, one as an extension of Erie street out to the harbor line from this line of piling, the other a pier 200 feet westerly and 100 feet in width, extending also out to the harbor line. That behind the latter row of piling, and extending to the shore and from the shore to the piling, has been made certain land, the whole surface of the soil under the lake having been filled up from the original shore line to the piling, so as to form a solid parcel of ground above the surface of the water of the lake.
That in 1898, at the request of the city council, the government established the above mentioned harbor line, which is approximately 1700 feet from the original shore line of the lake. The filling in was practically all done by the dumping of refuse, *230 excavations from cellars, streets and sewers, and with very little expense to the city.
On November 18, 1909, the council of the city of Cleveland passed an ordinance, No. 16,355, entering into a lease between it and the said defendant boat companies for the westerly of the two piers above mentioned; and on May 31, 1910, again entered into a similar lease ratifying and confirming the terms of the former lease to the defendant companies. By the terms of the latter lease it was provided that the city leased said pier to the defendant boat companies for the period commencing with the acceptance of the terms of the ordinance and ending December 31, 1909, at a rental of $55,000 for the entire period, to be paid by the lessees; the lessor to erect a suitable bridge over railroad tracks, pave certain approaches, and to provide a right-of-way and material and labor to construct a switch track from the pier leased to and connecting with the railroads, furnish. water and lighting facilities, and permit the lessees to widen the pier to the width of 300 feet. Lessees were given the right to construct upon the said pier a passenger station, ticket offices, freight warehouses, and such railroad tracks as shall be necessary for the use of the pier as a suitable .place for landing, and the transaction of package freight and passenger business. Section 3 of the agreement of lease provided that the city council may terminate the lease two years from January 1, next after giving a notice of its intention so to do. In such event the city is to repay to the lessees the amounts expended by them for their improvements, upon certain terms provided in the ordinance. By Section 7 it is provided that the lessees shall have full control of the pier, and shall have the right to restrict access thereto in such manner as to faeililate and accommodate their business. The lessor further covenants that it will not construct any pier west of the pier leased nearer than 300 feet of said leased pier when widened as provided in the lease.
The latter ordinance was passed after the enactment by the Legislature of Ohio of General Code, 3699-1 (101 O. L., 236), and recites that fact within its provisions.
I will first consider the question involved in the suits seeking to enjoin the city and the boat companies, defendants, from carrying out the terms of the proposed lease.
*231 The first question presented for determination is, what estate or interest was acquired by the city in the land appropriated under the proceedings of 1872? In this state it seems to be settled that unless the statute expressly authorizes the taking of the fee, no greater estate or interest is taken by the appropriation than is reasonably necessary for the full and complete enjoyment for the purpose for'which it is taken. The extent of the interest taken must be determined from the language of the statutue authorizing the appropriation. Unless the fee be expressly authorized to be taken, the interest taken will be limited by the public necessity. The leading ease upon this point in this state seems to be McCombs v. Stewart, 40 Ohio St., 647. At page 665 the court say:
“But, whether the property taken is paid for in money or in accruing benefits and advantages, it should clearly appear by the terms of the act that it was the legislative intent to take a fee before such effect can be given to it. In the absence of express words, a fee will not be deemed to be taken where the purposes of the act will be satisfied, as in the ease at bar, with the taking of an easement."
And again, in Vought v. Railway, 58 Ohio St., 123, in paragraph 5 of the syllabus, the court states the general rule thus:
“Where lands are acquired for a public use, an easement only is taken therein, unless the taking of a greater estate, as a fee simple, is expressly authorized by law."
Similar language is found in Corwin v. Cowan, 12 Ohio St., 629; Malone v. Toledo, 28 Ohio St., 643; and in Newton v. Railway, 115 Fed. Rep., 781.
At the time of the approporiation of the lands described, in 1872, Section 507 of the municipal code, Chapter 47, p. 234, provided:
“Each city and incorporated village shall have the power to appropriate, enter upon and hold real estate within the corporate limits for the following purposes, but no more shall be taken or appropriated than is reasonably necessary for the purpose to which it is to be applied. * * * 10. For public parks.”
"Section 509. The terms land and real estate, as used in this chapter, shall be regarded as including rights and easements of an incorporeal nature."
*232 Section 512 provided the procedure by which the council might apropriate private property, providing that same shall be done by resolution declaring such intent, defining therein the purpose of the appropriation, and setting out a pertinent description of the property to be appropriated.
Section 513 provided that, upon the passage of a resolution, an application should be made to the probate court, which application "shall describe as correctly as may be the property to be taken, the object proposed, and shall name the owners of the property.”
It will be observed that by Section 507 the right to take a fee is not expressly given; in fact it provides, "But.no more shall be appropriated than is reasonably necessary for the'- purpose to which it is to be applied. ’ ’
In the appropriation proceeding on October 14, 1872, the Cleveland & Pitsburgh Railroad Company, the plaintiff i-n one of the suits now under consideration, filed in the probate court, in said action, a paper endorsed, "Claim of the C. & P. Railroad Company. ’ ’ This paper was in the following language: ■
"The State of Ohio, Cuyahoga County, in Probate Court.
"The City of Cleveland v. J. M. Jones et al. Appropriation.
“The Cleveland & Pittsburgh Railroad Company, one of the defendants herein, represents that it is the owner in fee of certain lands situated between Wood and Erie streets in the city of Cleveland, and south of its right of way, 396 feet in width, and the land north of the right of way of the Lake Shore & Michigan Railway Company of 528 feet in width, as designated on the map attached to the petition in this case, and which is sought to be appropriated herein, for which this defendant claims damages in the sum of Thirty Thousand ($30,000) Dollars.
"R. P. Ranney,

“Attorney for said Company.

“ (Endorsed): City of Cleveland v. J. M. Jones et al. Claim of the Cleveland & Pittsburgh Railroad Company. October 14, 1872. Ranney.”
It has been urged that, by reason of the filing' of this paper, the Cleveland & Pittsburgh Railroad Company is'estopped to deny that by the apropriatio-n proceedings a fee was taken; or that this paper is an admission on the part of the railroad company that a fee was taken in the proceedings.
*233 This original appropriation proceeding was brought to appropriate twenty-one different parcels of land, of which the Cleveland & Pittsburgh Railroad Company owned one; and the order of the probate court was the same in respect to all of the parcels.
I think that the fact that the Cleveland & Pittsburgh Railroad Company filed this paper in the proceedings in' the probate court can not enlarge the interest which the city was authorized by the statute to take. Nowhere does the statute provide for such an answer in an appropriation proceeding; and such a paper, if filed, raises no issue (P. C. C. & St. L. Ry. v. Greenville, 69 Ohio St., 496). Nor does the fact that the resolution and application state that a fee is sought to be taken enlarge the power of the municipality (State v. Sheltrey, 100 Minn., 107). It could not well be said that, in a proceeding in which there were.twenty-one or more defendants, and twenty-one parcels of land appropriated, the title obtained as against the owner of one parcel differed from that obtained from the owners of other parcels in the same proceeding. While it is probable the owners of the property appropriated were compensated in the full value of the property, yet the court can not say — and there is no evidence — that they received value for anything other than the interest appropriated in the proceeding. The interest taken is determined by the provisions of the statute, and not by the measure of compensation allowed for the interest.
It is argued that, under Section 199, Chapter 15, of the municipal code of 1869 (66 O. L., 182), the city of Cleveland, at the time of the appropriation, under paragraph 32, had power "to hold and improve public grounds and parks, and provide for the protection and preservation of the same ’ ’; and, upder paragraph 33, "to appropriate private property for the uses of the corporation”; and, under paragraph 34, "to acquire, by purchase or otherwise, and hold real estate or any interest therein, and other property, for the uses of the corporation, and to sell or lease the same.”
From this section it is argued that the city had authority, at the time of the appropriation proceedings in 1872, to sell or lease the lands appropriated. It would seem that the authority to sell or lease, as provided in paragraph 34, did not apply to *234 lands appropriated under Section 35, bnt to those acquired in the manner provided by paragraph 34. In fact it is doubtful whether it would apply to all lands which might be acquired within the provisions of paragraph 34, as the paragraph in its terms includes dedicated property. It seems to me, therefore, that these sections do not enlarge the powers of acquisition provided in Section 507.
It is .further argued that Section 676, Chapter 54, of the municipal code of 1869 (66 O. L., 264), authorizes the city to lease or convey any real estate or interest therein, any wharf or public landing * * * public ground or park, belonging to the corporation.
I am of opinion that, taken in connection with Sections 677 and' 678, the authority conferred in this chapter does not apply to lands in which the city had an easement only, acquired by reason of its exercising the governmental power of the state, but applies solely to lands belonging to the city in its private capacity. And if I be wrong in this, then Section 676 would be unconstitutional in its application to lands in which the corporation acquired but an easement, if the city is given the right to sell the lands free from the easement by reason of the provisions of tin's section. And it further would seem clear that Section 676 at most must be confined to lands in which the municipality had a fee simple title.
Therefore, both by reason of the express provisions of the statute and by the authorities referred to, I hold that, by the appropriation proceedings of 1872, the city acquired only an easement in the land so appropriated.
The fact that only an easement for park purposes was taken leaves the fee still in the original owners, subject to the full and complete enjoyment of the use by the city for park purposes.
The next question that arises is, as to whether the use proposed to be made under the lease to the boat companies is within the terms of the easement taken by the city in the appropriation proceedings, assuming for the present that the pier and made land are part of the park.
The terms of the lease provide for the character of the occupancy and use to which the pier and part of the land devoted to switch tracks shall be subjected. This is stated in the lease *235 to be for the construction of a passenger' station, ticket offices, freight warehouses, railroad tracks, etc., with full right on the part of the boat companies to control the pier and to restrict access thereto, together with the right to widen the pier to 300 feet, and, further, prevent the construction of another pier within 300 feet of the leased pier so widened.
The terms of the ordinance recite that the proposed uses are consistent with park purposes; and it is urged that this declaration of council can not be disturbed by the court. In this the court thinks counsel are wrong. The statutes of Ohio, when the appropriation took place as well as now, discriminate between a park use and a wharf or landing use, and give cities power to' appropriate for each, recognizing that such uses are different. A park use is primarily for pleasure and recreation, and does not essentially imply, on the part of the city, the right to make a profit out of such use; while a wharf and landing import a use for commercial purposes and transactions of commerce. Now, some uses of parks for purposes of landings and wharfs, incidental to features of pleasure and recreation, may be embraced in park purposes; but where the use is solely for commercial purposes, and requires an exclusive occupancy of the whole or part of. the park, such use is not a park use. As well say that a railroad’s station freight house and ticket offices and other buildings and tracks are a park purpose. The character of the occupancy provided for in this lease is wholly commercial, and, notwithstanding the declaration of council, is not a park use. Whether the occupancy provided for in the lease is a public purpose, I will discuss later.
The next question to be considered, again assuming that the made land and the pier are part of the park, is, whether the Legislature can authorize a change of the use of lands, in which an easement has been acquired for park purposes by appropriation, to a use for wharf and landing purposes.
From the terms of the lease, I am inclined to hold that the use provided for therein is consistent with wharf and landing, purposes.
If a fee has been appropriated, it seems to be the law of this state that such change of use can be made from one purpose to another public purpose not inconsistent with the former use.
*236 Malone v. Toledo, 28 Ohio St., 643:
"The state having, by its proper agencies, appropriated property in fee for the public uses of canals, it' is within the power of the Legislature to authorize a change from one public use to another of like kind.”
Ordinarily, where only an easement is taken, upon abandoning the use of the land for the purpose for which appropriated, it reverts to the owner of the fee, free from the easement. Corwin v. Cowan, 12 Ohio St., 629; McCombs v. Stewart, 40 Ohio St., 647; Day v. Railway, 44 Ohio St., 406.
If only an easement has been taken, and the proposed new use is consistent with the former use, a change in the use may be authorized, provided compensation is made for any additional burden. Hatch v. Railway, 18 Ohio St., 92; Vought v. Railway, 58 Ohio St., 124; Newton v. Railway, 115 Fed. Rep., 781.
These cases all decide that the proposed change of one use to another use must be consistent; and if consistent, the change, if authorized by the Legislature of the state, can be made.
In determining whether the proposed use is substantially similar to the original use, the courts have been pretty liberal in interpreting what uses are consistent and similar — changing a canal to a railroad right-of-way, changing a canal to a street, changing a country road to a toll road, and other like instances.
As said in Malone v. Toledo, supra, page 656:
“When real estate is so appropriated, for one particular public purpose, the fact that it is by legislative authority applied to another public purpose is not necessarily an abandonment, nor is it a forfeiture of the public interest. Instances are abundant in the legislation of the state where land has been taken for one purpose and used for another, without objection or complaint from any one.”
Such change of use, however, must be for a public purpose, and not merely for a private use. In Malone v. Toledo, supra, at page 661, the court say:
“Since Hatch’s case, the change of a canal to a public highway, such as the street of a city, can not be held to be such a change as to destroy the public interest. The use is still a public one and of the same nature. Does, then, the addition of water pipes and sewerage require us to say that it is a change to an *237 entirely different purpose. In the present stage of municipal advancement, it must be considered that the public streets of a large city may legitimately be used for such purposes as these. Highways can not be confined solely to the uses to which they were adapted in the primitive state of mankind.”
It is not necessary to the decision of these eases, in the view I have taken, to determine the character of the proposed use by the boat companies under the leases, whether public or private. The occupancy of this pier is practically exclusive; and the city, as long as the lease is in force, is prohibited from building a pier westward nearer than 300 feet, and to the eastward nearer than 200 feet. Yet the city has the right, on giving notice and paying the boat companies for the improvements they have made, in the'manner required by the lease, to repossess itself of this pier and all things- granted by the lease. The boat companies áre public carriers by water, and are required to receive and transport passengers and freight for hire for whoever of the public requires their facilities. The character of the use to which the property leased is to be put partakes of the nature of a public rather than a private use, in the same sense that all the service furnished -by railroad corporations is public. As was said by Mr. Justice Peckham in the case of In re Mayor of New York, 135 N. Y., 253, where the claim was made that the appropriation by the city of New York, therein in question; was to be for the sole use of special kinds of commerce and steamboats, and to léase the piers or' property to certain steamboat companies, that such proposed use, under the circumstances of that ease, was a public use, as distinguished from a private use, the court saying, on page 265:
“This mere permission to use property by leasing it to others, can not be regarded as providing for its private use. When used by lessees under the facts already stated, the use is a public one. The use is public while the property is thus leased, because it fills an undisputed necessity existing in regard to these common carriers by water, who are themselves engaged in fulfilling their obligations to the general public, obligations which could not otherwise be properly or effectually performed; and in filling the'.necessity for such accommodation, the city or the state is only performing its public duty.”
*238 The Legislature, by authorizing the making of such lease (101 O. L., 236), has said, so far as it is able, that this is a public use; and the courts should not lightly disregard such declarations. So far as necessary to the discussion of the law of these cases,*I have, therefore, assumed that the use proposed under the lease is for a public purpose.
The next question is, whether the proposed change of use is so substantially similar as to be classed as consistent with a park use. As I have before said, the courts of Ohio seem to have been liberal in interpreting the change of use. We see in our streets every day many agencies illustrating what is included in or consistent with a street use. So, also, in examining what is a park use, we find a great diversity 'of structure and use. The fact that the possession of the pier is exclusive and the business commercial does not seem a greater diversion from park use than a steam railroad is from a canal. .
I therefore hold that the proposed use by the boat companies is not so inconsistent with the park use that such change can not be authorized by the Legislature.
This brings us to the question as to whether such a change of use as is proposed creates any additional burden upon the land for which the reversionary owner is entitled to compensation. The reversionary owner still has the fee. The only thing taken from him is the park use; and by authority of the Legislature (101 O. L., 236), a new use is sought to be placed by the city upon this fee. While the use proposed is consistent with the park use, yet it is different, and involves a different occupancy and use from that of a park use. All use not taken from the owner by the appropriation is still in him; and to place his property under a new and different use is to take something away from him which he theretofore had. . If so, the amount to which he is entitled as compensation for such different use is not for this court to determine. Clearly something is taken from him by the imposition upon the property of the new use. In Hatch v. Railway, supra, the court held that the change from canal use to railroad use entitled a reversionary owner to compensation for the additional burden. In that case the owner had acquiesced in the taking by the railroad, and brought his action for compensa *239 tion, treating the appropriation as an accomplished fact; and the court say, at page 122:
"The plaintiff, then, was entitled to compensation from the railroad company for the full value of such land as it may have taken from him not embraced in the appropriation made by the canal company; and for such additional burdens as may have been imposed upon the lands covered by the original appropriation ; and for damage done or accruing to his adjacent lands, by reason of the additional appropriation, if any, and of the change of structure and of use from those of a canal to those of a railroad, in so far as such damages are peculiar to himself as a proprietor, and not common to the public at large. As the owner of land, subject to a perpetual easement, but appropriated and paid for only for the purposes of a canal, he had rights which the railroad company can not be permitted to ignore', and which, we think, it ought to have instituted proceedings regularly, under the statute, to condemn and pay for, before it ventured to divert the easement to uses so variant from those originally intended. But this not having been done, and the plaintiff having resorted to this action for compensation, the rights of the parties are governed by the same principles which would have been applicable in such a proceeding. ’ ’
In Vought v. Railway, supra, where the action was to restrain the railroad from taking possession of property, which had been theretofore appropriated for canal purposes, until such railroad use had been appropriated; the court granted the injunction, enjoining the railroad from entering upon the lands until condemned and paid for.
Neither of these cases undertakes to fully state in what the additional burden consisted. So in the case before us the court does not think that it is for it to determine what the additional burden consists of.
There is language in Malone v. Toledo, 28 Ohio St., 655, 657, that indicates that a change from a canal to a street purpose would not be an additional burden, especially so to one who retains no rights as an adjoining owner. But while the language of the court there is applicable to both a 'fee and an easement, yet from the syllabus it appears that a fee was the estate under discussion and not a mere easement.
In view of the holding in Vought v. Railway, supra, it does *240 not seem that, where an easement only has been taken, there can be an imposition of a new use without an additional burden.
Where such an additional burden is placed upon the fee, the owner is' entitled to an injunction until the right to the changed use is condemned, notwithstanding the fact that such owner might, by acquiescing in the appropriation as an accomplished fact, bring his action for damages at law.
There has been no laches shown on the part of the reversionary owner in this case, and I therefore hold that the Cleveland & Pittsburgh Railroad Company is entitled to an injunction restraining the change of use until the right to such changed use is appropriated.
Some claim is made that the petition of the Cleveland & Pittsburgh Railroad Company is framed upon a different theory, and therefore plaintiff is not entitled to an injunction. But, as stated in Newton v. Railway, supra, at page 786, where a similar claim was mad:
“It is true the petition seeks a recovery upon -the ground of abandonment, but, under the Ohio practice, if the facts stated constitute a cause of action, the demurrer should have been overruled, notwithstanding the petition may contain allegations which would not entitle the plaintiff to a recovery upon another theory. In this case the petition states facts sufficient to entitle the plaintiff to recover for such injury as he has sustained by reason of the additional burden imposed upon the fee by its appropriation to railroad uses.”
We think the same may be said of the petition of the plaintiff in this case. The facts have been stated, and the prayer for relief is general; and upon the allegations, we think the proper relief should be an injunction, as was held in the above cited ease.
It also follows that the suit of the taxpayer, claiming the proposed new use is a diversion, can not be sustained, holding as I do that, by legislative authority, the city had the right to change from one purpose to another consistent purpose. Such change will work no, diversion of city interests, and therefore no right of the city will be impaired. The proposed use does not indicate any intention on the part of the city to abandon this land, but only an intention to use it for another consistent purpose ; and therefore the tax-payer is not entitled to any relief.
*241 What I have said above has been based on the assumption that the pier and made land were and are a part of the park, and affected by like considerations as the land originally-appropriated. Is such an assumption justified?
Counsel for the boat companies contend that the title to the land under the lake, on which the filling has been placed and the pier built, is in the state of Ohio, or in the city of Cleveland independent of its use of the land appropriated for park purposes. This contention is based on the holding of the Supreme Court in Sloan v. Beimiller, 34 Ohio St., 492. It is there held that the title of a riparian owner on Lake Erie extends to the line at which the water usually stands when free from disturbing causes; that -the title to the land under the water is in the state of Ohio.
This title of the state, however, is not proprietary, but in trust for public purposes of navigation and fishery.
It will be noticed, however, that the court, in the fourth syllabus, does not attempt to decide as to the right of a riparian owner to build out beyond his strict boundary line for the purpose of wharfs and landing places in aid of commerce, not, however, interfering with or obstructing navigation.
The evidence in this case shows that as early as 1898 the United States Government had established the harbor line in front of this property; and that, both before and since, the city has been filling into the lake until it has made the land out to the piers, and constructed the piers so that they terminate at the harbor line. No interference or objection has been made by the state of Ohio to such construction, but, on the contrary, by its legislation in 101 O. L., 236, it has recognized that such filling has been done.
It seems perfectly certain that such filling has not been done by the city independent of its use of the uplands and riparian rights appropriated for park purposes, although the piling set by the city was paid for out of the funds appropriated for river and harbor purposes; yet such payments do not alter old nor create new rights in the city. Neither the city nor the state had any proprietary title in the submerged lands, and therefore neither could fill in front of these lands and claim a proprietary right, any more than it could, by filling in front of lands *242 of other riparian owners on the lake, acquire a proprietary right.
In this country the right of the riparian owner in navigable waters has been variously dealt with by the several states, as shown by the case of Shively v. Bowlby, 152 U. S., 1. And that decision determined that the right of riparian owners is one for local determination by each state.. In the absence of such local determination, the question, when presented, has been. referred to the common law.
Confusion has arisen by reason of the fact that some of the courts have failed to discriminate between decisions made in respect to waters in which the Crown held the underlying title as a proprietary right, and waters in which the Crown held title to the underlying soil in trust for publie purposes only. In this country the states have succeeded to the right of the Crown under the common law. In those cases where the title to the underlying soil has been held to be in trust for the public purpose of navigation and fishery, the riparian owner has generally been held to have the right of access to navigable water, and the right to wharf out so long as he did not interfere with the publie right of navigation and fishery. Where title to the underlying soil has been held to be proprietary, the right of access and to wharf out has been denied. I do not say this rule has always been followed, but it serves to distinguish most of the cases. In accord with the first class of cases, we find the decisions of Dutton v. Strong, 66 U. S., 23; Yates v. Milwaukee, 77 U. S., 493; Illinois Cent. Ry. v. Illinois, 146 U. S., 387; Brookhaven v. Smith, 188 N. Y., 74; People v. Mould, 37 App. Div., 35; Hobart v. Hall, 174 Fed. Rep., 433; Fishmunger's Case, L. R., 10 C. H., 679; Duke of Buccleuch, L. R., 3 Exch., 306. On the other hand, we find Shively v. Bowlby, supra; In re Mayor, 135 N. Y., 253; Revell v. People, 177 Ill., 468; Cobb v. Comrs. Lincoln Park, 202 Ill., 427; Home for Aged Women v. Commonwealth, 202 Mass., 422, and other cases.
The case of Dutton v. Strong, supra, is cited in the case of Sloan v. Beimiller, supra, page 515; and at least gives countenance to the claim that the rule it announced was not disproved by the Supreme Court.
If the title was in .the state for public purposes of navigation and commerce, then it must almost inevitably follow that *243 that trust must embrace’all sucb facilities and instrumentalities ás will aid and further that purpose.
If it be held that a riparian owner has no right of access to navigable water and the right to wharf out to it, then- this trust in the state is idle and illusory. There is no one who can furnish the very things on which navigation and commerce depend, to-wit, wharfs reaching out to navigable water, and land on- which must be constructed .approaches by means of which wharfs can be reached. It is idle for the state itself to construct wharfs if it can not also have the land upon which to construct approaches. And it is just.as idle for a riparian owner to have the land and not be able to construct a wharf out to navigable water.
The better doctrine seems to be, especially where no decisions are found to the contrary, that this right of the riparian owner includes the right of access to navigable water, and the consequential right to wharf out to navigable water, so as to make his right practicable and available, in aid of the very purpose for which the state holds such lands in trust. In fact such trust must be held to include this right on the part of the riparian owner to wharf out, so long as he does not interfere with the public right of navigation and commerce.
The establishment of'the harbor line in 1898 or earlier fixed the point of navigability, and this determined the point beyond which the right to wharf out could not go. And since the state of Ohio has not interfered to prevent wharfing out to that point, no other person can prevent the riparian owner from availing himself of this right. In fact the right of the riparian owner seems exactly analogous to the right of the abutting owner in this state on a public street of the city. Such right of access, in this state, is a property right, of which the owner can hot be deprived without compensation. I am aware that this analogy is denied in Winifrede Co. v. Railway & Bridge Co., 24 Bull., 173, and perhaps rightly so, where the title of the state of Ohio in the bed of the Ohio river extended only to the low water mark; but in inland streams and rivers, when the ownership of the soil is to the center of the stream, the situation seems precisely like that on public highways and streets.
*244 Even if the right of access of a riparian owner is not such property right as to require compensation if taken by the United States or the state, in furtherance of the paramount right of navigation as held in Scranton v. Wheeler, 179 U. S., 141, the state or the United States are the only agencies that can rightfully deprive the owner of such right, and then only in furtherance of the public right of navigation and commerce.
In this case no claim is made that the state has taken any action to limit the right to fill out to navigable water, or declare the made land to be an interference with navigation. It must follow that this made land.was made by the city in connection with the riparian right which it appropriated; and whether the city obtained a title to the fee or only an easement to the soil underneath the filling when made, is not now important, for in either case it became affected by the same uses and purposes by which it held the upland, and consequently can not be disposed of, either by the city or state, independent of the purposes attached to the upland. Chicago v. Ward, 169 Ill., 392; Ward v. Field, 241 Ill., 496.
The reversionary right is attached to the riparian right just as fully and to the same extent as to the upland; and the use made of the land, in consequence of and in connection with the riparian right, can no more be changed by the city or state without a reappropriation than the upland.
The determination to which I have come, as above stated, is well set forth in Farnham, Waters, Sections 36-39c, 65, 66, 113, 113a, 113b, 113c, 114.
Counsel further have called attention to Chap. 35, Sections 442, 443 and 444 of the municipal code of 1866 (66 O. L., 222).
Section 442 provides that:
“The council of any city or- incorporated village shall have power to establish, construct, repair, control and regulate landing places, wharves, docks, piers and basins; to establish, control and regulate the grades of wharves and landing places, and to fix the rates of landing, wharfage and dockage, and to use, for the purposes aforesaid, any public landing or any property belonging to or under the control of the corporation."
Section 443 provides that:
*245 “All wharves or landing places hereafter constructed, shall conform to a uniform grade to be established by the council; and it shall be unlawful for the owner, lessee or occupant of such property to construct any wharf or landing place without first obtaining the consent of the council, and conforming to the established grade.”
Séction 444 provides that:
“The council shall have the use and control, for the above purpose, of the shore or bank of any lake or river, not the property of individuals, to the extent and in any manner that the state can grant such use or control; and the power to appoint harbor masters, wharf masters, port wardens, and other officers usual or proper for regulation of the navigation, trade or commerce of the corporation, to define their duties and powers, and fix their compensation.”
By the first of the above sections the city is given the right to use for wharves, docks and piers any property belonging to or under control of the corporation.
By Section 444 the council shall have the use and control, for the above purposes, of the shore or bank of any lake or river not the property of individuals,- to the extent and in any manner that the state can grant such use or control.
Taken together, the right granted to the city in the former section and to the council by the latter does not serve to increase or enlarge the estate which the corporation had in any lands. If the estate was limited to a particular use, the state could not increase the burden by imposing or authorizing a different use if the burden was increased. Section 444 expressly limits the grant by the state to the council to the extent and manner the state possessed. And Section 442 must be held to be applicable only to the lands in which the corporation or the state holds the fee. If literally applied, they would include dedicated lands and all lands held subject to special trusts.
There remain for decision the suits brought against the city of Cleveland by John G-. White and Charles E. White, as taxpayers and as reversionary owners, to restrain the appropriation of the fee in the lands appropriated for park purposes in the proceedings of 1872.
*246 The allegations of the two petitions are substantially the same, except .as to the capacity in which the plaintiffs bring the actions. The basis of both actions is, that the present appropriation proceedings, by which the fee is sought to be acquired, are not brought in good faith. That while the purpose of the appropriation, as expressed in the ordinance of council and the application made to the court of insolvency to assess compensation, is to acquire the fee of these lands for park purposes, yet the real purpose of the appropriation is to acquire the fee so as to enable the city to sell a portion of the land to the railroad companies for a new union depot site, and to validate the leases to the boat companies; and that the real purpose is to divert park lands to those other purposes; and that said action of council is an abuse of corporate power.
The right on the part of the plaintiffs, as reversionary owners, to bring the action to question the good faith and purpose of these appropriation proceedings is conceded to have been decided by the Supreme Court in P., C., C. & St. L. Ry. v. Greenville, 69 Ohio St., 487; and for the reasons stated in that case, the suits by the tax-payers are properly brought, as otherwise there is no opportunity to bring to the attention of a court the question of the good faith of such proceedings when instituted by a municipal corporation.
The resolution to appropriate the fee was passed by council, September 6, 1910, and notice thereof served upon the reversionary owners.
On October 24, 1910, an ordinance was passed transferring $2,000 from the contingency fund to the Lake View Park appropriation fund.
On November 14, 1910, the ordinance in question, to appropriate the rights of reversioners in these lands, was passed by council. The resolution above referred to, in Section 1 thereof, declares the necessity and intention of -council “to appropriate to park use for park purposes the absolute estate in fee simple of the following described lands:” (then follows the description) “but subject to all legal highways, intending hereby-to describe the lands usually known as Lake View Park; it being necessary, and the intent and purpose of the city of Cleveland, *247 as authorized by law, to acquire all outstanding interests of every kind, character and description in the lands hereinbefore described, and to vest in itself an absolute fee simple title thereto.”
The ordinance above referred to recites as follows:
"Whereas, the city of Clevland, by appropriation proceedings and otherwise, is the owner of certain interests in the land hereinafter described; and
"Whereas, it is necessary for the city of Cleveland to acquire a fee simple title to all of said lands, so hereinafter described;
‘ ‘ Therefore, be it ordained, by the council, ’ ’ etc.
"Section 1. That the absolute title in fee simple in the following described lands be, and the same is hereby, appropriated to public use for park purposes, to-wit: ’’ (describing the lands) "intending thereby to describe the lands usually known as Lake View Park, and all estates, interests, rights and titles of every kind, character and description in the lands hereinbefore described not now owned by the city of Cleveland; be, and the same are hereby, appropriated to public use for the purposes aforesaid.”
After the passage of said ordinance, and pursuant to its directions, the city solicitor made an application in the Insolvency Court of Cuyahoga County to assess compensation as provided by law. Said proceeding was set for hearing December 15, 1910.
From this ordinance it appears that the purpose for which the appropriation of the fee is made is declared to be "for park purposes. ’ ’ Plaintiffs in both suits allege, as stated, that this is not the real purpose, but that the real purpose is, to appropriate the fee in order to enable the city to sell part of these lands to the railroad companies, and to enable it to validate the leases to the boat companies, and for other purposes. The answer of the city in both cases denies any such purpose on the part of the city.
Evidence has been introduced to show that the Legislature authorized the appointment of a board of supervising architects May 6, 1902 (95 O. L., 879), to have supervision and control of the location of all the public municipal or county buildings to be erected upon ground already acquired within the limits of the city, and the size, height, style and general appearance of all such buildings, and requiring the approval by such board of all plans, specifications and locations. At the request of the city, *248 said board was appointed by the Governor in the year 1902. Thereafter this board prepared a comprehensive scheme for the grouping of the public buildings proposed to be erected, both by the city and the county.
On August 17, 1908, this board submitted two schemes in a report to the mayor of the city and to the council. In committee of the whole this report of the board was approved, or the action of council may have been only a vote of thanks to the board for its labors in preparation of the report. The evidence is not clear as to the exact action of council upon that occasion, as no record of such action has been kept.
By the report two general plans for the treatment of the grouping of proposed buildings and grounds were shown. One plan, “B,” which was recommended by the board, included in the general scheme of locatioiu of the buildings a passenger depot at the north end of the mall located on lands embraced within the limit of the park lands. The other plan shows an open plaza at the north end of the mall overlooking the park and lake, and gives no location for a depot, and omitted such a building entirely from the scheme. Just how or why a depot came to be included in this report is not clear, whether upon the suggestion of the city officials, the chamber of commerce, or the architects. Such a building was not a public building over which the board had any control.
Subsequently, in June, 1910, by .authority of the board, a second edition of its report, together with a supplemental report attached, was prepared, and the second plan or scheme above mentioned was omitted therefrom, and the one showing a depot at the north end of the mall being the only one retained.
I have stated this part of the evidence more fully than is perhaps necessary, but because this report and the first scheme above referred to is one of the principal foundations of the claim of the plaintiffs.
Shortly after the preparation of the first report, negotiations began between the mayor and council and representatives of the railroads, with a view to having a- depot included in the group plan on the location shown by the report. Such negotiations were carried on intermittently by Mayor Johnson and representatives of the railroads, with full knowledge of the council, from *249 that day forward during the entire incumbency of Mayor Johnson. Various other questions and-demands by both the city and the railroads were interjected into the discussion, and these negotiations were practically broken off, and ceased for some time.
In 1906 the rights of certain reversionary owners were transferred to the Cleveland Trust Company as trustee, under some arrangement by which the money to purchase such rights was furnished by the railroad companies, upon an understanding that such rights would be transferred to the city of Cleveland upon repayment to the railroad companies of the considerations upon which the reversionary rights had been purchased.
In March, 1906, the statute, under which the present appropriation proceedings were brought, was passed by the Legislature at the instance and suggestion of the mayor and city solicitor. Many conferences were held between the mayor, the representatives of the railroad companies and committees of the council. During all this time, but prior to January, 1909, no progress had been made, and nothing looking toward an agreement between the city and the railroads had taken place. Beginning about that date, negotiations were resumed, meetings were held in the mayor’s office, at which were present the mayor, some councilmen, representatives of the railroads, and other citizens, and plans for the construction of a union depot discussed.
On February 15, 1909, a resolution was passed by council, requesting the railroads to name a price they were willing to pay for the land .
On March 15, 1909, a resolution was passed by council, stating that, in the opinion of the council, the land was worth $3,000,000.
Neither of these resolutions got any response from the railroad companies.
On April 26, 1909, a resolution was passed by the council directing the city clerk to communicate with the railroads and ask if they really wanted the land for the purpose’ of erecting a depot; and on May 17, 1909, a resolution was passed reciting that council was impressed with the necessity of the immediate construction of a union depot, and was anxious that the negotiations for the sale of the necessary land should be pressed forward, and asking for a reply from the railroads to the resolutions before passed. .
*250 On September 27, 1909, council passed a resolution request- • ing a conference with tbe railroad companies and the boat companies and the committee on harbors and wharves.
On September 30, 1909, pursuant to said resolution, a meeting was held in the mayor’s office, at which were present the mayor, the city solicitor and other city representatives, the representatives of the railroads and of the boat companies. At this meeting it was -stated by Mr. Moon, on behalf of the railroads, that plans had been prepared by Mr. Burnham, but had not been agreed to. Mr. Moon stated that he was not prepared to proceed with the preparation of plans until the price of the land was agreed upon, and requested that a committee be appointed for the purpose of determining something about the price. At this meeting Mayor Johnson waived any questions in dispute other than the depot question, and the railroads, on their part, receded from their position that the entire lake front question should be settled at the same time.
On October 4, 1910, the council appointed the mayor, W. J. Sprmgfoorn, director of public service,- and Robert Hoffman, chief engineer, a committee to act on behalf of the city, in conjunction with the representatives of the railroads, in the preparation of plans for. the erection of a new union passenger station. No further meetings, however, were held between the mayor or this committee and representatives of the railroads.
On January 1, 1910, Mayor Johnson retired from office, and Mr. Baehr succeeded to the duties of mayor. At the' same time an entirely new council came into office.
On January 13, 1910, Mayor Baehr named a commission of citizens, consisting of Charles F. Adams, chairman, and others, to take up the question with the railroads of a new union station; and on January 17, he met this committee and a joint discussion took place as to the situation in respect to park lands and their availability for a new union depot site. Mr, Baker, the city solicitor, explained the former negotiations had during the term of Mayor Johnson. The mayor asked that the commission find out what the land needed for the station site was worth.
On March 15, 1910, another conference was held between the mayor, the depot commission and representatives of the railroads, and a map or plan showing plans for tracks on the land *251 to be used by the railroads was presented by engineer Hoffman. A general discussion was had by the representatives of the railroads, the city solicitor, and members of the commission, as to the value of the lands.
On March 30, 1910, another meeting was held, at which there were present, in addition to the mayor and the commission and representatives of the railroads, Mr. Burnham, of the group.plan commission. Mr. Burnham presented a new plan for the station, omitting the office • building which had been theretofore shown in the plan. The arrangement of tracks was shown in detail upon the plan. Discussion was had as to whether other railroads than the Lake Shore, Pennsylvania and the Big Four could be brought into the station. The cost of such a depot was discussed. Some question also arose as to the power to dispose of the land. Mr. Baker, city solicitor, told the commission he thought the city had power to acquire a fee simple title. It was further arranged that some action should be taken as to the price of the land wanted.
On March 31, 1910, the depot commission requested the Cleveland Real Estate Board to place a value upon the 35¼ acres needed for the proposed union depot site. This board fixed the total value at $1,871,871.75.
On May 7, 1910, another meeting was held between the mayor, members of the depot commission and representatives of the railroads. Mr. Moon, for the railroads, was asked what the railroads would pay, and declined to set a price.
On May 9, 1930, another meeting was held, substantially the same persons being present. The question of the use of the park lands was discussed, together with the question of the location of the depot, and whether-the railroads would consider a lease. Mr. Moon, for the railroads, stated he recognized the fact that the city owned the park property, and probably did not wish to sell' to anybody other than the railroads; and that possibly the city would be willing to make a price that would put the lands within the reach of the railroads; and that the proposed building was much greater than the railroads’ necessities, and that should be considered in making the price.
On May 23, a meeting was held, in which the mayor, the city solicitor, the commission, representatives of the railroads and *252 ■architect Burnham were present. Mr. Burnham explained the plan for a new station, but asked that plans might be more fully developed before submitting them. Mr. Burnham submitted a blueprint showing the lay-out of the tracks. The commission stated that they did not require a detailed plan, but such a one as would show the general character of the proposed building.
On July 11, 1910, the depot commission reported to the mayor that they had secured from the board of supervising architects the approval of 'the proposed union depot plan, and that steps had been taken to enter into an agreement between the city and the railroads; that questions had arisen as to whether the city could sell the land required for depot purposes, and requesting the opinion of the city solicitor. On July 16, in response to a request from the mayor, the city solicitor made reply, stating that he thought the lands could be acquired if terms could be agreed upon, not, however, expressing any opinion as to the method of acquisition.
On July 22, 1910, another meeting was held of the depot commission, the mayor, and representatives of the railroads. At this meeting the opinion of city solicitor Baker was read. At this meeting, also, Mr. Baker expressed,the opinion that, apart from any negotiations that the commission might have with the railroads, all public lands required by the city for public purposes should be acquired in fee. He further expressed the opinion that if the city brought proceedings to acquire the fee, a court would not inquire into the purpose of council, that it was an opportune time for the city to acquire the fee simple title, and he said that if the city was going to sell the land, it should find out first whether it could.
On August 23, 1910, the mayor requested city solicitor Baker to prepare the necessary legislation to appropriate the outstanding interests in the park, to which Mr. Baker replied that he had come to the conclusion that appropriation proceedings should be begun to acquire all outstanding rights in the property.
On August 26, 1910, Mr. Baker again wrote the mayor, stating the necessary proceedings that would have to take place in order to appropriate such rights.
On September 6, 1910, the resolution of council declaring its intention to appropriate, heretofore referred to, was passed.
*253 In the foregoing statement of the evidence, I have not undertaken to give the -evidence in detail, but rather to indicate the number of conferences that have been held and the subject-matter of the conferences. The evidence has ranged over a number of years, and it would be utterly impossible to set it out in detail. I have therefore contented myself with the statement of the above outline.
There is no direct evidence showing that 'the present council was in any way informed of the negotiations under Mayor Johnson’s administration, or influenced by them in passing this resolution and ordinance. Theye is no direct evidence showing that this council participated in or were conversant with the negotiations between Mayor Baehr and the depot commission, or were influenced thereby in passing this resolution and ordinance. No members of the present council or its committees, so far as appears from the evidence, were present at any such meeting held with the depot commission. There is no direct evidence indicating that the present council had in mind any effect of the present appropriation proceedings upon the leases to the boat companies, or were influenced to the passage of such proceedings by the fact that such leases had theretofore been made. _ Whatever finding is to be made in respect to the ulterior purpose, if any, of council in passing these appropriation proceedings, must be found from the acts and transactions of public officers of the city and private persons other than the members of the council itself. The fact that former councils may have had some negotiations looking toward the sale and transfer to the railroad companies of part of these park lands, can only be important as tending to show that the same intent persisted in the present council, and was operative to bring about the passage of these proceedings. During the trial, in admitting evidence of what took place between the various officers of ,,the city, couneilmen, board of supervision, and the representatives of the railroads prior to the incumbency of Mayor Baehr and the present council, I had considerable doubt as to the correctness of my ruling, as there was no direct evidence that any such acts or negotiations were brought to the attention of this present council, or that it had in any way been influenced by such negotiations in passing this ordinance; but the evidence of the acts of the former officials *254 of the city was finally admitted, on the theory that some continuity of purpose might be predicted on the action of the preceding council and city representatives as bearing upon or having some tendency to affect the acts of the present council, although the former council and mayor had passed out of- office and the present council was an entirely different body. I still have some doubt as to this evidence, but, in the conclusion which I have reached, I have given all the evidence admitted consideration.
If this appropriation proceeding had been begun without any negotiations having taken place with the railroads, there could be no doubt that the city could prosecute it in order to acquire the fee underlying the park lands. General Code, 3692, ex-. pressly authorizes such proceedings. The necessity for such proceedings is wholly in the discretion of council, and no court would, interfere with its exercise by council under such circumstances.
It is likewise certain that if council had acquired a fee in 1872, it could now lawfully deal with it on the basis of such ownership, and not be restricted simply to its use for park purposes.
Likewise it is true that council can not ostensibly appropriate for a public purpose, and then turn the property over to a private purpose. Such action would be clearly an abuse of corporate power, and unlawful. Whether council can acquire property for one public purpose,' but in reality intend to devote it to another public purpose, may be open to doubt. But it is clear that, having acquired it for one public purpose, it may thereafter change the use to another public purpose, especially where circumstances and conditions have so changed as to render the property unfit or impracticable for the first purpose. Such changes of use are clearly authorized by the decisions of our state. If there had been no negotiations with the railroad and boat companies, there would be no question of the wisdom of council in acquiring the fee to this property, in order that the city, having the fee, might deal with it in respect to the conditions and situation of the property as they might hereafter arise. The fact that an easement had been sufficient for all purposes of the city for forty years might be, under changed conditions, a very cogent reason for exercising its right to appropriate a fee in order .to deal with the property in the future on the basis of having the fee. Does the fact, then, that these negotiations have taken place, *255 show that it is any less desirable or any less the part of wisdom for council now to wish to acquire the fee? Undoubtedly not. So the wisdom of such acquisition of the fee must be granted, irrespective of the negotiations. Of course it might not be necessary to acquire it at this precise moment, but it is probable that the city might want the fee at some future moment, so as to change the use, and what more opportune time than now ?
But it is contended that, because of the negotiations, it must be held that the present declared purpose is not the real purpose, but that the real purpose is disclosed by the negotiations. Undoubtedly the negotiations brought forcibly to the attention of the city officials the condition of this title, and the city’s inability to deal with this land for other than park purposes; and this seems to have been the most probable reason for the action of council in passing this ordinance, in order that, as conditions arose, it might deal with this property as might seem most beneficial to the public. The right of council to carry on these appropriation proceedings had there been no negotiations, being unquestioned, we then have a case where the declared purpose of council is clearly and palpably wise and lawful; and a claim made that such declared purpose is not the real purpose, but a mere subterfuge to enable the city to turn over to the railroads about 35 acres out of a total of 90 acres or more of the park land.
Every intendment of the lawfulness of the action of council must be presumed by the courts; and this presumption must stand until overcome by clear and convincing evidence. The court can not hold that the purpose declared by council is not the real purpose, unless it be satisfied from all the evidence that the declared purpose is not the true purpose. No other rule than this can be applied in a case where the action of a legislative body is attacked.
From the evidence before the court, it appears that, while negotiations have been carried on by representatives of the city and the railroad companies towards a transfer of about thirty-five acres to the railroads for a depot site, yet at no time has there been any agreement of the city or the railroads as to either the building of a depot or as to the consideration or terms upon which a transfer of the proposed site might be made. Negotiations have been pending for seven years under Mayor Johnson, *256 and since under the present mayor, and yet have produced no definite results. The entire plan seems as' yet to be in a tentative shape. It may be entirely given up or abandoned. No one is committed to any such definite proposition that the court can predicate of these negotiations to date any fixed and definite purpose on the part of the city to transfer the site, or of the railroad companies to build a depot on the proposed site, or that any terms of sale will ever be agreed to between the parties. Such negotiations might have influenced the purpose of council, but it would seem to be giving to the evidence the utmost effect to say that it is probable that if the city acquires these rights, it will convey the site to the railroad companies, and that this was the probable purpose of the council in passing the resolution. But, as I have said before, there is no direct evidence at all in respect to any such ulterior purpose on the part of the present council. The only evidence looking to such purpose in the council is, that negotiations were carried on between the former mayor and council and the railroads, and between the present mayor and the railroads; and that the present mayor, in carrying on such negotiations begun by his predecessor, ascertained that the title was such that the city was unable to deal with this land for any other purpose than park purposes; and the present council, feeling certain that the time would surely come when it would be only the course of prudence and wisdom for the city to have the fee of this property, instituted these proceedings to acquire the fee.
That such a course is in accordance with the present policy of the state is evidenced by the recent legislation enacting that in every appropriation of land.for public purposes a fee shall be taken, unless a lesser interest is specified in the appropriation ordinance; and also the legislation under which this proceeding has been undertaken authorizing the acquisition of a fee where only an easement has heretofore been acquired.
Such a course being so manifestly prudent, the court finds that the evidence as to the ulterior purpose does not rise to that degree of clearness and conviction that would warrant the court in enjoining this proceeding.
I therefore refuse the injunction, and dismiss the cases brought to enjoin the appropriation proceeding.